## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| | : | |
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | **Crim. No. 1:19-CR-000390 (RC)** |
| | : | |
| MICHAEL WILKINS, | : | |
| Defendant. | : | |
| | : | |

## GOVERNMENT'S OPPOSITION TO
## DEFENDANT'S MOTION TO SUPPRESS TANGIBLE EVIDENCE

COMES NOW, The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, hereby submits this opposition to defendant Michael Wilkins's motion to suppress tangible evidence, specifically two cellphones and an Instagram account and the data contained therein (ECF No. 39). For the reasons set forth below, the motion should be denied without the need for an evidentiary hearing.

### I.    Introduction

Three search warrants are at issue: (1) the Search and Seizure Warrant issued on September 18, 2019 for a ZTE cellular phone ("ZTE Warrant") seized incident to the defendant's arrest for a traffic violation on June 18, 2018; (2) the Search and Seizure Warrant issued on November 8, 2019 for a Samsung cellular phone ("Samsung Warrant") seized incident to the defendant's arrest on November 5, 2019; and (3) the Search and Seizure Warrant issued on November 8, 2019 for the Instagram account associated with "THEREAL_LUCKYCHARM" a.k.a. "Michael Wilkins" ("Facebook Warrant").

In his motion, the defendant claims that the ZTE Warrant was issued without probable cause and after a fifteen month delay following the ZTE phone's seizure. Although there was a

1

delay between the seizure of the phone and the detective's submission of a search warrant application in relation to the phone, the delay did negate probable cause.  Furthermore, at no time during those fifteen months did the defendant seek the return of his phone, rendering null any supposed possessory interest he had in the phone.

The defendant further asserts that the ZTE and Facebook search warrants obtained by the government after being presented to a neutral, detached magistrate judge lacked probable cause, and that all three challenged warrants are fatally overbroad.  For the reasons set forth below, these arguments are without merit.  Even assuming, *arguendo*, that the warrants lacked probable cause or were overbroad, law enforcement acted in good faith at all times in obtaining and executing the search warrants authorized by the Court.

The government therefore respectfully requests that this Honorable Court deny the defendant's motion to suppress.

## II.     Factual Background

Members of the Metropolitan Police Department of the District of Columbia ("MPD") and the FBI's Child Exploitation and Human Trafficking Task Force ("CEHTTF") have been actively investigating an area of Washington, DC known for street-level commercial sexual exploitation.  This area stretches from the South at K Street, Northwest to the North at Rhode Island Avenue, Northwest, and from the East at 9th Street, Northwest, to the West at 14th Street Northwest.  Individuals who frequent this area commonly refer to it as the "Track" or the "Blade."  The Track is the subject of a substantial number of complaints to police between the hours of 3:30 a.m. to 8:00 a.m. by individuals residing or working in the area.  These complaints are primarily related to crimes stemming from the ongoing commercial sexual exploitation

activity occurring in this area, to include complaints of robberies, prostitution, disorderly conduct, and violent assaults.

On July 26, 2019, members of the CEHTTF participated in a prostitution proactive operation on the Track, where they conducted surveillance, contacted potential victims and witnesses, and identified individuals engaging in commercial sexual exploitation and/or sex trafficking. During this surveillance, law enforcement observed Michael Jabaar Wilkins (hereinafter the "defendant") driving a Cadillac sedan. Law enforcement observed a woman, later identified as Victim 1, enter the car the defendant was driving at a BP gas station located on 13th Street in Northwest Washington, D.C. Members of the CEHTTF observed the defendant drive away from the gas station, and approach the intersection located at Rhode Island Avenue and 1st Avenue Northwest. The defendant's vehicle was last seen heading towards the border of the District of Columbia and Maryland.

On August 3, 2019, members of MPD's Human Trafficking Unit (HTU) were acting in an undercover capacity around the Track, including one HTU member who was posing as a prostitute ("UC"). The defendant approached the UC in a conversion van and asked who she worked for and why she was out on his block. He asked if she was looking for a date and grew agitated before walking away. The defendant continued to watch the UC as she interacted with potential commercial sex customers. When a customer the UC was speaking with left the area, the defendant approached her and asked why she was giving money away, to which she responded that she did not turn any tricks for $15. The defendant then asked how much money the UC had on her and reached for her fanny pack. The UC swatted the defendant's hand away, and he squared up in a fighting stance and chest bumped her. He then told the UC to go sit in the

green van so that they could talk.  The UC informed the defendant that she had not "chosen up," and that she was not going anywhere with him.

On August 7, 2019, at approximately 7:00 a.m., a resident of the 1300 block of 12th Street, Northwest observed an assault behind her home.  The assault was also captured by surveillance footage.  The reporting witness advised that she saw a male, whom the witness believes is a pimp, attack a female whom the witness referred to as a prostitute.  The reporting witness forwarded this information and the surveillance footage to a member of MPD's Third District.  A review of the surveillance footage shows the defendant physically assaulting Victim 1.  The video depicts the defendant cornering Victim 1 in the parking pad of a home in the 1300 block of 12th Street Northwest.  The defendant is shown grabbing Victim 1's arm as she attempts to move away from him, and striking her with an open hand.  The video also shows the defendant grabbing either side of Victim 1's head and neck and shaking her head.  During this assault, Victim 1, who is trapped against a car, attempts to shield her face from the defendant.

On August 8, 2019, MPD's Third District forwarded a copy of the surveillance video showing the assault to Detective Thomas Sullivan, a CEHTTF investigator.  Detective Sullivan acted expeditiously.  He conducted a records search of open source and law enforcement databases in an effort to determine the Victim 1's identity.  A photograph of Victim 1 was uploaded to facial recognition software, which led to a match.  Law enforcement learned that Victim 1 was a witness to an incident in Norfolk, Virginia, on June 12, 2019, in which the defendant suffered a gunshot wound to his groin.  Information provided to law enforcement about this incident has led to the conclusion that this gunshot wound was self-inflicted.

Through an open source database search, Detective Sullivan discovered a T-Mobile phone number identified as belonging to Victim 1.  Upon searching a database that compiles

commercial sex advertisements, he learned that the phone number was linked to 691 commercial sex advertisements, depicting Victim 1, between February 1, 2019 and August 10, 2019.

Detective Sullivan also searched the social media website, Instagram, which resulted in the identification of a private account named thereal_luckycharm, which features a photograph of the defendant as the profile picture. A member of the CEHTTF thereafter searched a social media account used by a known trafficker, which has been assumed by law enforcement, to locate any interactions between the defendant's Instagram account and the known trafficker. They were successful. The search uncovered conversations between the defendant and the known trafficker using "pimp slang"—i.e., terms used by individuals engaged in commercial sexual exploitation as pimps to reinforce the culture and lifestyle of a pimp. The defendant provided a T-Mobile phone number, (757) 785-7182, to the known trafficker via Instagram Direct Message. Detective Sullivan's public records search of this phone number revealed that it had been used or identified as belonging to the defendant on several occasions.

In addition to the investigative steps detailed above, Detective Sullivan searched law enforcement databases and open source databases in an attempt to identify a history of law enforcement's contacts with the defendant. This search revealed that a witness advised law enforcement on September 9, 2017 that he had known the defendant since he was a child, and that the defendant was a pimp who has a history of being involved in narcotics distribution. The witness further reported that the defendant had transported at least three women to Washington, DC to engage in prostitution, and that he had been arrested in Virginia with one of these women.

It was this law enforcement contacts search that first revealed to Detective Sullivan a June 18, 2018 arrest of the defendant. The details of that arrest are, as follows: Members of MPD's Third District observed a vehicle the defendant was operating in the K Street area of Washington,

DC multiple times that day, driving around the Track.  The members also witnessed the operator

of the vehicle approach and speak with women who were known to engage in commercial sex

work.  The members observed the defendant commit a traffic offense and conducted a traffic stop,

which led to his arrest for "No Permit."  During his arrest, a ZTE cellular phone was found on his

person, and it was seized incident to his arrest.  At the time of his arrest, the defendant was a person

of interest to MPD in relation to ongoing prostitution-related activity on the Track.  The ZTE phone

has remained in MPD's custody since its seizure.

On September 12, 2019, law enforcement observed the defendant transporting Victim 1

to a local hotel in order to engage in a commercial sex "date".  What neither the defendant nor

Victim 1 knew on that occasions was that this "date" was actual a law enforcement officer,

acting in an undercover capacity.  Upon her arrival at the pre-arranged meeting location, a hotel,

Victim 1 was arrested.  A cellular telephone was seized from Victim 1 and vouchered as

evidence.  When interviewed by law enforcement in September of 2019, Victim 1 identified the

defendant as her pimp and stated that his nickname is "Lucky."  On that same date, law

enforcement also observed the green van, described above, shortly after Victim 1 was arrested,

and they conducted a traffic stop of the vehicle, which was observed idling at a gas station for an

extended period of time.  The defendant was the driver of the vehicle, and there were no other

occupants in the vehicle.  The defendant agreed to a search of his vehicle.   Several purses, a bulk

package of Trojan condoms, and items of female clothing were located in the van.  The

defendant was not placed under arrest, and he was free to leave that that time.

A mere six days after the arrest of Victim 1, on September 18, 2019, Detective Sullivan

applied for a warrant to search the ZTE phone that had been seized from the defendant's person

incident to his arrest in June 2018, as well as for the cellular telephone seized from Victim 1 incident to her arrest.  Magistrate Judge Meriweather issued the warrant the same day.

A review of the defendant's text messages with Victim 1, found on the phone recovered from Victim 1, show that he has engaged in a pattern of persuading, inducing, and coercing her to travel from Virginia to D.C. in order to engage in commercial sex acts for his financial gain. For example, on August 16, 2019, the defendant sent a text message to Victim 1 which stated, "Get up baby come on down here I've been telling the my b**** coming back its prime time Friday daddy broke ass shit im hurting I need my hoe to do her hoely dutys hurry up n come see about me."  On August 31, 2019, the defendant sent a "selfie"-style photograph which included a message which reads, "come home bitch."

Additional text messages found on Victim 1's phone show that the defendant often preyed upon Victim 1's feelings for him, in an effort to entice her into engaging in commercial sexual activity for his benefit.  The defendant sent Victim 1 a series of text messages which read, "I still hav love for u stop crying I want to make things right come on back up here with me we need eachother baby"; "Daddy gon take care of u"; and "Don't be no fool bitch stay focused that bitch washy washy get ur ass on the bus n let's carry on our mission bitch…."  On September 3, 2019, the defendant sent Victim 1 a series of texts that read, "So why don't us come up here so we can get sum money"; "Its no need for me to wait for u cuz i know you aint coming back cuz if u was u would have been came im just ready to come back n get on my mission to get me some money my car right n find me a new bitch a strong one"; and "So get up here then lets get all the money we can get so I can grind while im home."  Subsequent text exchanges on September 3 – 4, 2019 discuss Victim 1 traveling by bus from Norfolk, VA to Washington, D.C. Through these messages, Victim 1 provided the defendant with the address of Union Station,

located in Washington D.C., and informed him that she would arrive at 1:30 a.m. on the morning

of September 5, 2019.  A text message exchange, which occurred on September 5, 2019 at

approximately 4:25 a.m., reads as follows:

> Defendant: Walk down 2 12
> Defendant: Move on the outskirts
> Victim 1: OK what u seen police harassing[1]

Additional text messages found on Victim 1's phone, between the defendant and Victim

1 on September 5, 2019, reveal that at approximately 6:21 p.m. on that date, the defendant

instructed Victim 1 to, "Go head to the room bitch."  Victim 1 responded, "When they call IMA

lower my rates just by a dub doe."[2]  The defendant replied, "Okay a bagger cant be choosy or

picking they hav to accept what they give them that's not us but everything is negotiable."  The

defendant then texted Victim 1, at 9:05 pm, "I'm bout to date him for room…text you the room

number when done daddy."

During the early morning hours of November 3, 2019, members of CEHTTF had reason

to believe that the defendant and Victim 1 were in the D.C. area.  It appeared that they were on

or near the Track between approximately 3:00 a.m. and 7:00 a.m.  On November 4, 2019,

members of the CEHTTF conducted surveillance on the track between approximately 6:00 a.m.

to 7:30 a.m.  Law enforcement observed Victim 1 standing near the intersection of 12th Street

and M Street Northwest, and later observed the defendant operating the Hyundai Elantra near the

south edge of Logan Circle.

---

[1] All text abbreviations and typographical errors in quoted text appear as they do in the original evidence.
[2] Based upon the training and experience, of Detective Sullivan, the affiant of the search warrants at issue, this translates roughly to "I had to drop the price by $20 though."

On November 5, 2019, at approximately 5:00 a.m., law enforcement observed the defendant operating the same Hyundai Elantra near the intersection of 14th and Rhode Island Avenue Northwest.  The defendant was stopped in the identified Hyundai Elantra at the 1100 block of 14th Street Northwest, and taken into custody by the FBI WFO Tactical Team.  He had $1,204 in cash on his person.  The defendant was in the possession of a Samsung cellular telephone at the time of his arrest, which was seized incident to his arrest.  Three days later, on November 8, 2019, Detective Sullivan applied for warrants to search the Samsung phone and the Instagram account thereal_luckycharm.  Magistrate Judge Harvey issued the warrants the same day.

### III.   Legal Standard for Suppression Motions

If evidence was seized pursuant to a search warrant, the defendant bears the burden of proving that the evidence in question was seized in violation of his Fourth Amendment rights. *See, e.g.*, *United States v. Hassanshahi*, 75 F. Supp. 3d 101, 108 (D.D.C. 2014) (citing *Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978) & *United States v. Jones*, 374 F.Supp.2d 143, 147 (D.D.C. 2005)).  Factual allegations set forth in a defendant's motion to suppress must not be "merely conclusory or conjectural," and an evidentiary hearing is only required if the factual allegations, "if established, would warrant relief."  *See United States v. Thornton*, 454 F.2d 957, 967 n. 65 (D.C. Cir. 1971) (citations omitted).

IV.   **Argument**

A.   **Any Delay in the Government's Investigation Did Not Implicate the Defendant's Constitutional Rights.[3]**

To assess the reasonableness of a seizure, courts "must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *United States v. Place*, 462 U.S. 696, 703 (1983). While the delay in securing the ZTE Warrant was not brief by any means, it did not constitute a "meaningful interference" with any recognizable possessory interest of this specific defendant. *See United States v. Jacobsen*, 466 U.S. 109, 113 (1984). One who was unaware of or, as here, expressed no concern about a detriment to his possessory interest during the duration of the government's warrantless custody of his property cannot later claim to have experienced any such interference—much less a meaningful one. *See id.* at 124–26 (noting government's intrusion on possessory interest went "unnoticed" by defendant); *United States v. Johns*, 469 U.S. 478, 487 (1985) (defendants who "never sought return of the property" cannot argue that "the delay in the search ... adversely affected legitimate interests protected by the Fourth Amendment"); *see also United States v. Stabile*, 633 F.3d 219, 235 (3d Cir. 2011), *cert. denied*, 132 S. Ct. 399 (U.S. 2011) (affirming denial of suppression motion after finding defendant's possessory interest in computer "undermine[d]" by fact that he did not ask for return of hard drives until eighteen months after initial seizure).

In rejecting an argument that a one-year delay between a seizure and search pursuant to a warrant was unreasonable, the Eighth Circuit held that "[t]o the extent [the defendant] complains

---

[3] In his motion, the defendant does not challenge the initial seizure of the ZTE phone incident to his arrest, which was a legal seizure of the phone; he only challenges the delay between the phone's seizure and Detective Sullivan's application for a warrant to search its contents.

of interference with his possessory interest in the [device], Rule 41(g) of the Federal Rules of
Criminal Procedure provided a remedy he did not invoke." *United States v. Gregoire*, 638 F.3d
962, 968 (8th Cir. 2011).  Similarly, in the instant case, the defendant did not invoke Rule 41(g)[4]
until the instant motion, *nearly two and a half years* after the phone's initial seizure.
Accordingly, any possessory interest the defendant may once have had in the phone should be
deemed waived.  *See United States v. Colbert*, 474 F.2d 174, 176 (5th Cir.1973) (en banc) ("[I]t
is settled law that one has no standing to complain of a search or seizure of property he has
voluntarily abandoned.").  Moreover, based on messages recovered from the defendant's
Instagram account, it appears that the defendant replaced the ZTE phone shortly after his June
2018 arrest,[5] further undermining his possessory interest in the phone.  *See United States v.
Sparks*, 806 F.3d 1323, 1344 (11th Cir. 2015), *overruled on other grounds by United States v.
Ross*, 963 F.3d 1056 (11th Cir. 2020) ("Where, as here, the purchase of a replacement phone
follows the ceasing of efforts to recover the original phone despite knowledge of how to obtain
the return of the original phone through reasonable efforts, those actions provide further
confirmation of a deliberate decision to abandon the original phone.").

    The defendant's reliance on *United States v. Mitchell* is misplaced given the facts of this
case.  *See United States v. Mitchell*, 565 F.3d 1347 (11th Cir. 2009).  The Eleventh Circuit in
*Mitchell* found a "substantial" possessory interest was implicated when the defendant's hard
drive was seized by the government because it deprived him of the "digital equivalent of [his]
home."  *Mitchell*, 565 F.3d at 1351–52.  But here, the defendant's claimed possessory interest in

---

[4] Because this was an arrest by MPD, the local rules may have been applicable.  However, the
defendant likewise did not exercise his rights under the identical Rule 41(g) of the Superior
Court Rules of Criminal Procedure.
[5] Detective Sullivan is prepared to testify to this fact, if desired, at an evidentiary hearing.

the ZTE phone is disingenuous.  At no point until the instant motion—two years and four months after law enforcement's seizure of the phone—did the defendant seek the return of the ZTE phone.  This notable lack of concern over his access to its contents trivializes any recognizable interest that might have been interfered with by the government's delay.  Moreover, the ZTE phone—a smart phone—did not require any password or biometrics for access,[6] diminishing any alleged privacy interest the defendant had in the phone.  *Cf., e.g.*, *Trulock v. Freeh*, 275 F.3d 391, 403 (4th Cir. 2001) ("By using a password, [the defendant] affirmatively intended to exclude…others from his personal files [in a computer].")

Further bolstering the government's end of the balancing test, at the time of the phone's initial seizure, the defendant was a person of interest to MPD officers, who were aware that he was involved in ongoing prostitution-related activity in a specific bounded area in Northwest, Washington, DC.  ZTE Warrant Aff., Para. 22.  Subsequent investigation revealed that the defendant had been actively engaged in the trafficking of females for the purpose of prostitution since at least 2017.  *Id.* at Para. 20.  Also weighing in favor of the government is its "interest in protecting evidence from destruction[,]" which is "particularly high where digital evidence is involved, because such evidence is inherently ephemeral and easily destructible."  *United States v. Bradley*, 488 F. App'x 99, 104 (6th Cir. 2012) (unpublished).

In sum, the defendant's possessory interest in the phone, which he never raised or asserted in any form for nearly two and a half years, is meager in comparison with the government's interest in preserving evidence of sex trafficking and commercial sexual exploitation that is contained in the ZTE phone.  Thus, the totality of the circumstances demonstrate that law enforcement's actions here were reasonable.  *See Stabile*, 633 F.3d at 235.

---

[6] Detective Sullivan is prepared to testify to this fact, if desired, at an evidentiary hearing.

**B. There Was Probable Cause to Search the Defendant's Cell Phone and Instagram Account.**

The search warrant affidavits reflect ample probable cause to search the defendant's ZTE phone and Instagram account.  In evaluating probable cause, the assessment should be a "practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place."  *U.S. v. Cardoza*, 713 F.3d 656, 659 (D.C. Cir. 2013) (citing *Illinois v. Gates*, 462 U.S. 213 (1983)). The sufficiency of the showing underlying the issuance of a search warrant requires "not a prima facie showing," only a "fair probability."  *Gates*, 462 U.S. at 235.

As articulated by the Supreme Court, "[p]robable cause is not a high bar."  *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018).  In *Wesby*, the Court reaffirmed that:

> Because probable cause deals with probabilities and depends on the totality of the circumstances, it is a fluid concept that is not readily, or even usefully, reduced to a neat set of legal rules.  It requires only a probability or substantial chance of criminal activity, not an actual showing of such activity.

*Id.* (citations and punctuation omitted).  The D.C. Circuit accords "great deference" to the judicial officer's determination of probable cause.  *United States v. Spencer*, 530 F.3d 1003, 1006 (D.C. Cir. 2008) (citing *Gates*, 462 U.S. at 236).  Furthermore, under the *Leon* good faith exception, "suppression of evidence is usually not required when officers conduct a search in reasonable reliance on a search warrant issued by a detached and neutral magistrate."  *Cardoza*, 713 F.3d at 658 (citing *Leon*, 468 U.S. at 897).

i.  *The ZTE Warrant Affidavit Established Probable Cause.*

A fair reading of the ZTE Warrant affidavit reveals that more than sufficient probable cause existed to search the defendant's phone for evidence of trafficking-related offenses.  In the affidavit, Detective Sullivan included the following facts:  (1) in September 2017, a witness

advised law enforcement that he had known the defendant since he was a child, and that the defendant was a "pimp and "had transported at least three women to Washington, DC to engage in prostitution"; (2) on June 18, 2018, in the early morning hours, law enforcement observed a vehicle the defendant was operating driving around a known prostitution area and observed the operator of the vehicle speak with known prostitutes; (3) that same day, the defendant was arrested for a traffic offense while operating the same vehicle in the same area, and MPD officers seized the ZTE phone from his person incident to his arrest; (4) the affiant reviewed surveillance footage dated August 7, 2019, which had been provided by a resident living near the known prostitution area, and the footage depicted a man the affiant recognized as the defendant assaulting a woman known to be engaging in commercial sex work (hereinafter referred to as "Victim 1") in the area, and the audio of the video makes clear the assault was a result of a disagreement over prostitution activity; and (5) a search of a social media account used by a known trafficker, which had been assumed by law enforcement, revealed conversations between the defendant and the known trafficker "using pimp slang terms," and showed that the defendant had provided a phone number associated with him to the known trafficker via Instagram Direct Message.  ZTE Warrant Aff., Paras. 9–12, 18–20, 22.

With these facts alone, there was more than sufficient probable cause—which, again, "is not a high bar," *Wesby*, 138 S. Ct. at 586—that the defendant had committed violations of 18 U.S.C. § 1591, the federal sex trafficking statute.  The affidavit went on to detail how on September 12, 2019, an undercover officer arranged a commercial sex "date" with Victim 1, that Victim 1 was dropped off for the "date" by a person operating a Dodge Ram van, and that the defendant was observed and stopped by law enforcement, shortly thereafter, driving the same van seen dropping off Victim 1 for the commercial sex "date."  ZTE Warrant Aff., Paras. 24–26.

14

The defendant argues that the affidavit failed to allege that he was "observed using the phone immediately after apprehension" or was "known to have communicated on the phone with conspirators." Def's Mot. Supp. 11. He ignores, however, the affidavit's statements that the ZTE phone was found "on his person" the same day he was observed interacting with women known to engage in commercial sex, that the defendant provided his phone number to a known trafficker (presumably to communicate with him using the cellular phone), and that the defendant and the known trafficker conversed via Instagram using "pimp slang terms." ZTE Warrant Aff., Paras. 18–19, 27; *cf. United States v. Thomas*, 989 F.2d 1252, 1254–55 (D.C. Cir. 1993) (holding that "observations of illegal activity occurring away from the suspect's residence, can support a finding of probable cause to issue a search warrant for the residence, if there is a reasonable basis to infer from the nature of the illegal activity observed, that relevant evidence will be found in the residence").

As demonstrated above, the facts in the affidavit clearly establish a "fair probability" that evidence of trafficking-related offenses and the identities of "other females who have been trafficked by" the defendant would be located on the ZTE phone. *See Gates*, 462 U.S. at 235; ZTE Warrant Aff., Paras. 20, 27.

ii. *The Facebook Warrant Affidavit Establishes Probable Cause.*

Similarly, the Facebook Warrant affidavit reflects ample probable cause to search the defendant's Instagram account for evidence of trafficking-related offenses. Contrary to the defendant's claim that the affidavit was "void of any concrete or reliable support for Detective Sullivan's speculatory statements," Def's Mot. Supp. 13–14, the affidavit is replete with facts demonstrating probable cause to search the Instagram account for evidence of sex trafficking. The affidavit states that: (1) the target Instagram account's name is Thereal_luckycharm, and it

bore a photograph of the defendant as the profile picture; (2) the woman dropped off for a commercial sex "date' with an undercover officer by the defendant in September 2019 identified him as her pimp and said she knew him as "Lucky"; and (3) based on Detective Sullivan's training and experience:

> Pimps and their prostitutes are now meeting with increased regularity via social media like Instagram, Facebook, Snapchat, and other popular social media websites.  Pimps use these websites to promote their lifestyles, wealth, and belongings as a way to recruit females into their stable.  Pimps use the social media accounts to directly message or contact potential prostitutes to begin the recruitment process by applying pressure or attempting to sell the pimp lifestyle to the victims.

Facebook Warrant Aff., Paras. 3.f, 17, 26–28.

Even without Detective Sullivan's statements about his training and experience, there was sufficient probable cause to search the defendant's Instagram account because there was ample evidence that he was using his Instagram account to conduct his trafficking operation.  For example, a search of a social media account used by a known trafficker, which had been assumed by law enforcement, revealed conversations between the defendant and the known trafficker "using pimp slang terms," and showed that the defendant had provided a phone number associated with him to the known trafficker via Instagram Direct Message.  Facebook Warrant Aff., Paras. 19–20.

Text messages obtained from the phones of the complainant and the defendant further demonstrate that he repeatedly attempted to persuade, induce, and entice the complaint to travel from Norfolk, VA to Washington D.C., in order for her to engage in prostitution for his benefit. *See, supra*, section II; Facebook Warrant Aff., Paras. 30–34.  In addition, geographic location data for the phone numbers tied to Victim 1 and the defendant revealed that they were "consistently in close proximity" to one another, and that they frequented hotels in DC,

Maryland, and Virginia during a time period in which commercial sex advertisements for Victim 1 were active.  *Id.* at Para. 37.  Furthermore, on November 3, 2019, task force members used the geolocation data associated with phones belonging to Victim 1 and the defendant to pinpoint the defendant's and Victim 1's location on the Track between approximately 3:00 a.m. and 7:00 a.m. and then at a motel near Andrew Air Force Base in Maryland.  *Id.* at Para. 41.

In addition to the specific evidence from this investigation, Detective Sullivan's statements about his training and experience regarding trafficking operations, in general, strengthened the already sufficient probable cause for the search.  Magistrate Judge Harvey was entitled to "give considerable weight to the conclusions of this experienced law enforcement officer regarding where evidence of a crime was likely to be found."  *See, e.g.*, *United States v. Hodge*, 246 F.3d 301, 307 (3d Cir. 2001) (internal citation, quotation marks, and punctuation omitted).  For example, in drug trafficking cases, the D.C. Circuit has, through the lens of *Leon*, given deference to the training and experience of an affiant-officer's observations regarding the likelihood of finding contraband in a drug trafficker's home.  *See, e.g.*, *United States v. Washington*, 775 F.3d 405, 409 (D.C. Cir. 2014).  Similarly here, Detective Sullivan's observations regarding the general practices of pimps in commercial sex operations—specifically, that pimps communicate with prostitutes working for them through social media—should be given due credit.  *See id.*; Facebook Warrant Aff., Para. 3f.  In light of the ubiquity of social media, and given that pimps, like drug dealers, "don't tend to work out of office buildings[, …] no training is required to reach this commonsense conclusion." *United States v. Spencer*, 530 F.3d 1003, 1007 (D.C. Cir. 2008); *see also United States v. Griffith*, 867 F.3d 1265, 1268 (D.C. Cir. 2017) ("[O]ur phones frequently contain information chronicling our daily lives—where we go, whom we see, what we say to our friends, and the like.").

As described above, the affidavit describes in detail text conversations between the defendant and Victim 1 that corroborate the defendant's status as the man who was commercially sexually exploiting her. *See, e.g.*, Facebook Warrant Aff., Para. 31 ("its prime time Friday daddy broke ass shit im hurting I need my hoe to do her hoely dutys"). While it is true that boiler-plate generalizations, alone, might be insufficient to establish probable cause or render official reliance on them reasonable, the other facts in the affidavit, taken together with the observations founded upon Detective Sullivan's training and experience, support reasonable reliance and are sufficient to establish probable cause.

The defendant also asserts that the affidavit did not provide support for why a search of the "entire account" could yield additional evidence, and that a search of the entire account was not necessary to confirm that the defendant used the account. Def's Mot. Supp. 13–14. Both claims are without merit. As detailed above, Detective Sullivan set forth several facts establishing probable cause that the defendant had committed trafficking-related offenses, including that he had transported women to engage in commercial sex since at least September 2017, and that he had exchanged messages with a known trafficker through the Instagram account using pimp slang terms in December 2018. *See, supra*, section IV.B.i. Given the existence of multiple potential trafficking victims and the multi-year span in which the defendant was alleged to have committed these criminal offenses, it was reasonable for Detective Sullivan to request, and for Magistrate Judge Harvey to authorize, a search of the entire Instagram account for evidence of wrongdoing and the identities of other trafficking victims. Furthermore, as specifically stated in the Affidavit, Detective Sullivan sought authorization to search the entirety of the identified Instagram account in order to find information that could confirm WILKIN's identity as the social media user. *See,* Facebook Warrant Aff., Para. 50; *See also,*

*infra,* section IV.C (addressing overbreadth argument).  Finally, absent an admission from the defendant that he used the Instagram account, it is absurd to argue that the government was somehow wrong in seeking additional circumstantial evidence that the Instagram account belonged to the defendant.  In any event, the defendant cites no authority for his position, which is yet another reason that it should be disregarded.

Because the facts in the affidavit establish a fair probability that evidence of trafficking-related offenses and the identities of other potential trafficking victims would be found in the target Instagram account, the defendant's motion should be denied on this basis, as well.

### C. The Warrants Authorizing the Search of the Phones and the Instagram Account Were Not Overbroad.

The defendant erroneously contends that the warrant was overly broad, citing this Court's decision in *Matter of Black iPhone 4*, 27 F. Supp. 3d 74, because "law enforcement conducted a full data extraction from the smart phone and seized thousands of digital files without any probable cause to believe that the recovered data implicated criminal activity of any kind." Def.'s Mot. Supp. 17.  While plucking language helpful to his position, the defendant misses the key holding of *Matter of Black iPhone 4*.  In that case, the Court denied a warrant application after finding that the government had not established probable cause for the broad seizure of data in the defendant's iPhone.  27 F. Supp. 3d at 78.  However, in *Matter of Black iPhone 4,* the Court went on to state that "[w]ith one simple modification, these Applications would have avoided the overbreadth problem: seize this information only insofar as it pertains to violations of [two statutes]."  *Id.*

The Court's exact proposal was incorporated into the warrant applications at issue in this case.  In each of the challenged application's attachments, under information or property "to be seized," Detective Sullivan requested to seize information constituting "fruits," "evidence,"

"contraband," and "instrumentalities … *relating to violations of*" various named statutes, "as described in the search warrant affidavit." ZTE Warrant Aff., Att. B, Para. 1 (emphasis added); Samsung Warrant Aff., Att. B. Para. 1; *see also* Facebook Warrant Aff., Att. B, Sec. II. Accordingly, under the rationale *Matter of Black iPhone 4*, the warrant applications contain no overbreadth defect.

The defendant also discusses *United States v. Winn*, a decision not binding on this Court, at great length but ultimately to no avail. 79 F. Supp. 3d 904 (S.D. Ill. 2015). In that case, the District Court for the Southern District of Illinois took issue "with the description of the object of the search—'any or all files'" because, in its view, the "police did not have probable cause to believe that *everything* on the phone was evidence of the crime of public indecency." *Id.* at 919. It further explained that the "complaint did not offer any basis…to believe that the calendar, phonebook, contacts, SMS messages, [etc.] were connected with Winn's act of public indecency." *Id.* at 919–20.

Detective Sullivan took care to ensure that the warrant applications were sufficiently particular as to the items and data sought, including by incorporating the accompanying affidavits by reference. *United States v. Triplett*, 684 F.3d 500, 505 (5th Cir. 2012) (holding that affidavit incorporated by reference served to "amplify particularity," and that "[w]hen viewed alongside the affidavit, the warrant's list of items to be seized is reasonably focused"). In addition to confining the information to be seized and searched to violations of specific statutes, *see Matter of Black iPhone 4*, 27 F. Supp. 3d at 78, the warrant applications identified numerous types of records and information sought, including those "relating to the identity or location of perpetrators, aiders and abettors, coconspirators" (as previewed by the Detective's statements regarding the defendant's conversations with "a known trafficker" and eyewitnesses to the

August 2019 assault).  *See, e.g.,* ZTE Warrant Aff., Att. B, Para. 1b.  In other words, the warrant

applications do not reflect general "any and all records" requests that would allow law

enforcement to seize anything and everything on the devices and target account.

Federal appellate courts have uniformly declined to require "search protocols" in warrant

applications that tell the police in advance how exactly to search an electronic device.  *See*

*United States v. Perez*, 712 F. App'x 136, 139–40 (3d Cir. 2017) (collecting cases).  This Court

has previously acknowledged courts' "legitimate concerns about hamstringing a valid criminal

investigation by binding the government to a strict search protocol *ex ante*."  *Matter of Black*

*iPhone 4*, 27 F. Supp. 3d at 79 (citing *United States v. Burgess*, 576 F.3d 1078, 1094 (10th Cir.

2009)).  Indeed, "[i]t is unrealistic to expect a warrant to prospectively restrict the scope of a

search by directory, filename or extension or to attempt to structure search methods—that

process must remain dynamic."  *Burgess*, 576 F.3d at 1093; *see also* Orin S. Kerr, Searches and

Seizures in a Digital World, 119 Harv. L. Rev. 531, 545 (2005) ("Exact search protocols are

difficult to settle ex ante; good forensic analysis is an art more than a science.")

Here, there is no meaningful way for law enforcement to know what falls within the scope

of the warrant as it pertains to electronic evidence without review of the entire return, to include

the invariable viewing of items that are not the object of the search.  This practical understanding

is endorsed by courts.  *See Perez*, 712 F. App'x at 139–40.  For example, in the context of a

premises warrant, a peek into a nightstand drawer that could conceal a gun may instead reveal a

person's prescription medications.  Similarly, in a search through a person's personal papers, "it

is certain that some innocuous documents will be examined, at least cursorily, in order to determine

whether they are, in fact, among those papers authorized to be seized."  *Andresen v. Maryland*,

427 U.S. 463, 482 n.11 (1976).  Such intrusions, especially in the context of a cellphone, cannot

be avoided – when the targets of a search are almost universally intermingled with innocent objects, everything must be reviewed before it can be determined to be relevant and within the scope of the warrant.

It is unclear whether the defendant is suggesting that law enforcement must limit their search to certain parts of phones or social media accounts, but many state and federal courts have rejected such efforts. *See, e.g.*, *United States v. Bass*, 785 F.3d 1043, 1049–50 (6th Cir. 2015) (rejecting particularity and overbreadth challenges to warrant authorizing search of cell phone for broad array of "records"); *United States v. Christie*, 717 F.3d 1156, 1165 (10th Cir. 2013) (holding computer search warrant "may pass the particularity test if they limit their scope . . . to evidence of specific federal crimes."); *United States v. Bishop*, 910 F.3d 335, 336 (7th Cir. 2018) ("This warrant does permit the police to look at every file on his phone and decide which files satisfy the description.  But he is wrong to think that this makes a warrant too general.  Criminals don't advertise where they keep evidence."); *Hedgepath v. Commonwealth*, 441 S.W.3d 119, 130–31 (Ky. 2014) ("[T]hough the warrant did not limit the parts of the cell phone that could be searched, or the types of files or data that were to be sought, the clear thrust of the warrant was for evidence related to the physical and sexual assaults committed on Mary Reyes. . . . The search warrant and affidavit were sufficiently particular, both as to the cell phone and the type of evidence sought, to make the search of the cell phone reasonable."); *People v. Lopez*, No. 341089, 2019 WL 1370716, at *5 (Mich. Ct. App. Mar. 26, 2019) ("When the search is limited to evidence explicitly authorized in the warrant—here, evidence pertaining to the crime of assault with intent to murder—it is reasonable for officers to search through the data and applications on the phone to determine whether it contains the sought after evidence."); *People v. English*, 32 N.Y.S.3d 837, 840 (Sup. Ct. 2016) ("[T]o follow defendant's invitation and to require courts in advance to restrict the

computer search to certain methodologies or terms would give criminals the ability to evade law enforcement scrutiny by utilizing coded terms in their files or documents, or placing such documents in areas of the computer that would not normally contain such files/documents."). Criminals will naturally seek to conceal wrongdoing, throwing police searches that look only in the most obvious places.  In light of this obvious reality, courts should not artificially limit searches of digital evidence.

This is particularly true in a trafficking case where the defendant was using his phone and Instagram to conduct his business.  He was setting up "dates" for multiple women; picking women up and driving them places, including across state lines; posting advertisements; and communicating with other traffickers.  In this case, there was no way for law enforcement to know which portions of the gigabytes of data found in the cellphones and Instagram account contained evidence related to the crimes under investigation in this case, or where exactly they would be found.  While the defendant quotes a single case that imposed protocols for limited searches of the digital material in a phone at the warrant application stage, no additional protocols beyond those already included in the warrant application were imposed by the magistrate judge here.  Facebook Warrant, Att. B.  Moreover, *Winn* was a public indecency case. 79 F. Supp. 3d 904.   As such, the evidence that supported probable cause in that case was substantially different in nature and scope than the evidence that supports a finding of probable cause in this trafficking investigation.  Probative evidence can be—and in this case was—found in the defendant's contacts, call log, messages, GPS location data, etc., unlike in *Winn*, where the court found "only two categories of data could possibly be evidence of the crime: photos and videos."  79 F. Supp. 3d at 919.  The defendant provides no real argument as to which items were seized in excess of the warrant's terms and should therefore be returned, destroyed, or

which would be inadmissible at trial.  The defendant simply leaves the government and the Court to guess which items might fall within the scope of the warrant and which might not.

As alluded to above, the warrant itself provided protections against seizing information outside the scope of the warrant.  When requesting information from a social media provider, such as Instagram, it is impossible for the provider to know what items may be relevant to the investigation.  This does not mean, however, that the government can seize the entirety of the defendant's Instagram account for any information it might wish to utilize for any purpose.  As Attachment B makes clear, the government must search the information provided and "determine which information is within the scope of the information to be seized" as specified in the warrant. *See* Facebook Warrant, Att. B.  Only that information that is within the scope of Section II of Attachment B may be copied and retained by the United States for use in the investigation.

The Court may also consider the "end result of the search" to assess whether the warrants were overbroad and their overall reasonableness.  *United States v. Heldt*, 668 F.2d 1238, 1268 (D.C. Cir. 1981).  Here, the warrants sought information pertaining to trafficking-related offenses. And that is exactly what law enforcement found.  As described in detail above, the cell phone warrants yielded geolocation data supportive of transportation across state lines for the purposes of prostitution, as well as series of text message exchanges in which the defendant entices the complainant to travel from Norfolk, VA to Washington D.C. to engage in prostitution for his benefit.  *See, supra*, section II; Facebook Warrant Aff., Paras. 30–34.  The return from the Instagram warrant likewise shows the defendant attempting to entice another woman ("Victim 2") to engage in prostitution for his financial benefit.  For example, in a series of messages found in the defendant's Instagram account between March and July 2019, the defendant told Victim 2, "Hey bitch u need stop playing like u gangsta bitch n come on back home to daddy!"; "U was real solid u never said a word u stucked to the H-code like a real bitch should n whenever you come back I have a top

spot."[7]   The Instagram return also revealed various phone numbers used by the defendant and conversations between the defendant and other known pimps, such as Rashaun Parks and Rodriguez Cole.[8]   The wealth of probative information obtained as a result of the warrants thus undercuts the defendant's argument that they were fatally overbroad.

Finally, the defendant argues—without citing any controlling authority—that the warrants were overbroad because they were not confined to a date range.  Def's Mot. Supp. 17. The government is unaware of any precedent in this Circuit *requiring* a warrant to include a temporal limitation, though such limitations may be favorable to the defendant.  *See, e.g.*, *United States v. Jacobson*, 4 F. Supp. 3d 515, 526 (E.D.N.Y. 2014) (holding that "absence of a time frame did not render the otherwise particularized warrants unconstitutionally general" where "crimes under investigation were complex and concerned a long period of time, not simply one or two dates of criminal activity").  Here, like in *Jacobson*, Detective Sullivan was investigating a relatively complex commercial sexual exploitation scheme involving multiple alleged victims over the span of several years across several jurisdictions.  Although the application attachments did not explicitly apply a date range to the information to be seized, they all request to seize and search information "relating to violations of a specific statute or statutes, *as described in the search warrant affidavit.*"  *E.g.*, ZTE Warrant Aff., Att. B., Para. 1.  Accordingly, the statements in the affidavit served to "amplify particularity" and put some temporal bounds for the executing officers to apply with respect to the conduct to be investigated.  *See Triplett*, 684 F.3d at 505.

For these reasons, the defendant's motion to suppress the evidence found in the cellphones and Instagram account should be denied.

---

[7] Detective Sullivan is prepared to testify to this fact, if desired, at an evidentiary hearing.
[8] *Id.*

**D.  The *Leon* Good Faith Exception, If Necessary, Defeats the Motion to Suppress.**

As detailed fully above, there was sufficient probable cause to support the issuance of these search warrants, and the delay between the seizure of the ZTE phone and the application for a search warrant did not violate the defendant's Fourth Amendment rights.  If this Court were to conclude otherwise, however, the evidence seized should not be suppressed under *Leon*'s good faith exception to the exclusionary rule.  *See Leon*, 468 U.S. 897.

In *Leon*, the Supreme Court considered "whether the Fourth Amendment exclusionary rule should be modified so as not to bar the use in the prosecution's case-in-chief of evidence obtained by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate but ultimately found to be unsupported by probable cause."  *Id.* at 900.  The Court ultimately ruled that "suppression is appropriate only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause."  *Id*. at 926.  The Supreme Court has suggested that an officer's decision to obtain a warrant is *prima facie* evidence that he or she was acting in good faith.  *See id.* at 921 n.21.  This rule exists no doubt in part due to the concern that, contrary to the Fourth Amendment's aims, "applying the exclusionary rule to warrant searches may well reduce incentives for police to utilize the preferred warrant procedure" in favor of warrantless searches.  *See Illinois v. Gates*, 462 U.S. 213, 263 (1983) (White, J., concurring).

In *Leon*, the Supreme Court identified four narrow circumstances in which suppression would remain an appropriate remedy and where reliance on a faulty search warrant would not be objectively reasonable:

> (1) the magistrate or judge in issuing a warrant was misled by
> information in an affidavit that the affiant knew was false or would
> have known was false except for his reckless disregard of the truth;
> (2) the issuing magistrate wholly abandoned his judicial role;
> (3) [the] affidavit [was] 'so lacking in indicia of probable cause as
> to render official belief in its existence entirely unreasonable";
> (4) [the] warrant [is] so facially deficient—i.e., in failing to
> particularize the place to be searched or the things to be seized—
> that the executing officers cannot reasonably presume it to be
> valid.

*Leon*, 468 U.S. at 923 (numbered list added); *see also United States v. Spencer*, 530 F.3d 1003,

1007 (D.C. Cir. 2008) (applying the "few narrow exceptions to the *Leon* principle").  The first

exception listed above "also has been held to apply under certain circumstances to material

omissions."  *Spencer*, 530 F.3d at 1007 (citing *United States v. Johnson,* 696 F.2d 115, 118 n. 21

(D.C. Cir. 1982)).

    None of the *Leon* exceptions are applicable to the search warrants in this case.[9]  The

defendant has not identified any false or misleading statement or material omission in the

warrant affidavits and thus, there is no assertion that the first exception to *Leon* could possibly

apply.  468 U.S. at 923.  Indeed, even the challenged delay between the seizure of the ZTE

phone and the application for the search warrant was spelled out explicitly for the reviewing

magistrate judge in Detective Sullivan's warrant affidavit.  ZTE Warrant Aff., Paras. 22, 27.

While insinuating that the magistrate judges' approval of the ZTE and Facebook Warrants

"reduce[d] the warrant requirement to a mere rubber stamp," the defendant has proffered no

evidence that Magistrate Judges Harvey or Meriweather "wholly abandoned [their] judicial role."

---

[9] Besides a passing reference to *United States v. Griffith*, 867 F.3d 1265, 1278 (D.C. Cir. 2017), the defendant's motion fails to include any analysis as to why the good faith exception does not apply here.  Nevertheless, the government will summarily respond to some of the defendant's inaccurate characterizations and erroneous assertions of the applicable legal standard that the Court may find relevant to its analysis.

*Leon*, 468 U.S. at 923.  As to the third *Leon* exception, the warrant affidavits clearly do not present a paucity of indicia of probable cause such that a reasonably well-trained officer would have known that the searches were illegal despite the magistrate judge's authorization.  *See, supra*, section IV.B.  Finally, with respect to the fourth exception, the affidavits and search warrants particularized the places to be searched—that is, specific information contained in the phones and Instagram account.  *See, supra*, sections IV.B–C; *United States v. Maxwell*, 920 F.2d 1028, 1034 (D.C. Cir. 1990) (declining to suppress evidence obtained from defendant's apartment pursuant to search warrant under *Leon* despite conclusion that warrant was overly broad).

Of particular relevance to the Court's good faith reliance assessment, it is common practice for federal prosecutors to work together with law enforcement officers in drafting affidavits in support of a warrant application.  Such was the case here, as the affiant's three sets of warrant affidavits and attachments were reviewed thoroughly by the U.S. Attorney's Office.[10] This fact further shows that law enforcement acted in reasonable reliance upon all warrants issued in this case when conducting their searches.  *See e.g.*, *Leon*, 468 U.S. at 904 n.4 (applying good faith exception where officers consulted with three deputy district attorneys before submitting deficient warrant to the court); *United States v. Johnson*, 78 F.3d 1258, 1264 (8th Cir. 1986) (noting that seeking the advice of a district attorney is a factor weighing in favor of determining that the officer's reliance on the warrant was objectively reasonable); *United States v. Brown*, 951 F.2d 999, 1005 (9th Cir. 1991) (noting "an officer's consultation with a government attorney is of significant importance to a finding of good faith").

---

[10] Detective Sullivan is prepared to testify to this fact, if desired, at an evidentiary hearing.

In sum, none of the narrow circumstances justifying a departure from the good faith exception articulated in *Leon* are present, and the officers acted reasonably in executing the search warrants.  Accordingly, to the extent this Court finds any of the search warrants defective, or that the delay between the seizure of the ZTE phone and the applications for a warrant to search its contents was unreasonable, the good faith exception should apply.  *Leon*, 468 U.S. at 923.  Therefore, based upon the foregoing reasons, the defendant's motion to suppress be denied.

## CONCLUSION

For these reasons, the government respectfully requests that the Defendant's Motion to Suppress Tangible Evidence be denied in its entirety.


Dated: November 6, 2020                              Respectfully submitted,

                                                     MICHAEL SHERWIN
                                                     ACTING UNITED STATES ATTORNEY

                                                      /s/  *Amy E. Larson*
                                                             Amy E. Larson, N.Y. Bar Number 4108221
                                                             Assistant United States Attorney
                                                             555 Fourth Street, N.W.
                                                             Washington, D.C. 20530
                                                             Telephone: (202) 252-7863
                                                             Email: Amy.Larson2@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that the GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO SUPRESS TANGIBLE EVIDENCE was duly served upon the defendant by electronic means via the Court's ECF system.

This 6th day of November, 2020.

_/s/   Amy E. Larson_____
Amy E. Larson, N.Y. Bar Number 4108221
Assistant United States Attorney
555 Fourth Street, N.W.
Washington, D.C. 20530
Telephone: (202) 252-7863
Email: Amy.Larson2@usdoj.gov