UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Criminal No. 19-CR-390 (RC) |
| v. | : | |
| | : | |
| MICHAEL JABAAR WILKINS, | : | |
| | : | |
| Defendant. | : | Trial: April 19, 2021 |

## GOVERNMENT'S MOTION FOR ORDER PROHIBITING CONTACT WITH VICTIMS AND WITNESSES

The United States of America, by and through the United States Attorney for the District of Columbia, submits this motion for an order prohibiting defendant Michael Jabaar Wilkins (hereinafter "DEFENDANT") from having any contact, direct, indirect or through third parties, with known victims and witnesses in this matter. The DEFENDANT has been ordered detained pending trial and is in the custody of the U.S. Marshal Service and housed at the D.C. Jail. Pursuant to the rules of the facility, the DEFENDANT is allowed to use telephones, email, U.S. mail, and in-person video visitation to contact persons outside of the facility. Non-legal telephone calls and emails are monitored and recorded. Through review of these recorded calls, the government has learned that DEFENDANT has attempted to communicate with one of the victims in this case, J.J., who has specifically asked that the DEFENDANT stop contacting her. Furthermore, between November of 2020 and January 2021, the DEFENDANT called L.H. over forty times, often discussing the pending case and asking her questions about what she has said to law enforcement.

If the DEFENDANT were on pre-trial release, subject to an appearance bond, he would be subject to an order prohibiting him from having contact, direct, indirect, or through

third parties, with victims and witnesses as a condition of pre-trial supervision. Similarly, the Government is seeking this Court to order the DEFENDANT to not have contact with any victims or witnesses related to this case. Certainly if the DEFENDANT desires to have his appointed counsel contact victims and witnesses on his behalf, this can occur without the DEFENDANT communicating with the victims or witnesses directly. However, two of the witnesses in this case, J.J. and O.R., have expressed to the Government that they do not wish to speak with the DEFENDANT's counsel or his investigator. The Government has been informed that the DEFENDANT's counsel and investigator have come to their homes, unannounced, which has caused them to fear for their safety and the safety of their families.

## **BACKGROUND**

In the summer of 2019, Members of the Metropolitan Police Department of the District of Columbia ("MPD") and the FBI Child Exploitation and Human Trafficking Task Force ("CEHTTF") were actively investigating an area of Washington, DC known for the violent sex trafficking of young women and girls. This area stretches from the South at K Street, Northwest to the North at Rhode Island Avenue, Northwest, and from the East at 9th Street, Northwest, to the West at 14th Street Northwest. Individuals who frequent this area commonly refer to it as the "Track" or the "Blade." Back in 2019, and continuing through today, the Track is the subject of a substantial number of complaints to police between the hours of 3:30 a.m. to 8:00 a.m. by individuals living or working in the area. These complaints are primarily related to crimes stemming from the ongoing commercial sexual exploitation activity occurring in this area, to include complaints of robberies, prostitution, disorderly conduct, and violent assaults.

On July 26, 2019, members of the CEHTTF participated in a prostitution proactive operation on the Track, where they conducted surveillance, contacted potential victims and witnesses, and identified individuals engaging in commercial sexual exploitation and/or sex trafficking.  During this surveillance, law enforcement observed the DEFENDANT driving a Cadillac sedan.  Law enforcement observed a woman, later identified as a victim in this case, L.H., enter the car the DEFENDANT was driving at a BP gas station located on 13th Street in Northwest Washington, D.C.  Members of the CEHTTF observed the DEFENDANT drive away from the gas station, and approach the intersection located at Rhode Island Avenue and 1st Avenue Northwest.  The DEFENDANT's vehicle was last seen heading towards the border of the District of Columbia and Maryland.

On August 7, 2019, at approximately 7:00 a.m., a resident of the 1300 block of 12th Street, Northwest observed an assault behind her home.  The assault was also captured by surveillance footage.  The reporting witness advised that she saw a male, whom the witness believes is a pimp, attack a female whom the witness referred to as a prostitute.  The reporting witness forwarded this information and the surveillance footage to a member of MPD's Third District.  A review of the surveillance footage shows the DEFENDANT physically assaulting L.H. The video depicts the DEFENDANT cornering L.H. in the parking pad of a home in the 1300 block of 12th Street Northwest. The DEFENDANT is shown grabbing L.H.'s arm as she attempts to move away from him, and striking her with an open hand.  The video also shows the DEFENDANT grabbing either side of L.H.'s head and neck, and shaking her head.  During this assault, L.H., who is trapped against a car, attempts to shield her face from the DEFENDANT.

In the months that followed, law enforcement frequently encountered the DEFENDANT in the vicinity of the Track.  In August of that year, he aggressively encountered a

female police officer, acting in an undercover capacity, and attempted to question her about what she was doing on the Track and why she was there without a pimp.  In September of 2019, law enforcement observed the DEFENDANT drop L.H. off at a local hotel, in order to engage in a commercial sex date.  What neither the DEFEDNANT nor L.H. knew at the time was that the "date" was actually an enforcement operation conducted by law enforcement.  L.H. was arrested, and, when interviewed by law enforcement, she admitted that the DEFENDANT, a pimp named Lucky, dropped her off for the date.  The DEFENDANT was observed at a gas station across the street in a van that contained marijuana, women's clothing and shoes, and a large box of condoms.

L.H.'s phone was recovered during this arrest, and forensically reviewed by law enforcement.  A review of the DEFENDANT's text messages with L.H. is deeply disturbing.  The DEFENDANT uses a combination of tactics – including manipulation, verbal abuse, and threats of physical harm – in an effort to convince L.H. to engage in commercial sex acts for his financial benefit.  For example, on August 16, 2019, the DEFENDANT sent text to L.H. which stated, "Get up baby come on down here I've been telling the my b**** coming back its prime time Friday daddy broke ass shit im hurting I need my hoe to do her hoely dutys hurry up n come see about me."  On August 31, 2019, the DEFENDANT sent L.H. a "selfie"-style photograph which included a message which reads, "come home bitch."

Additional text messages show that the DEFENDANT often preyed upon L.H.'s feelings for him, in an effort to entice her into engaging in commercial sexual activity for his benefit.  The DEFENDANT sent L.H. a series of text messages which read, "I still hav love for u stop crying I want to make things right come on back up here with me we need eachother baby"; "Daddy gon take care of u"; and "Don't be no fool bitch stay focused that bitch washy washy get ur ass on the bus n let's carry on our mission bitch…".  On September 3, 2019, the DEFENDANT

sent L.H. a series of texts that read, "So why don't us come up here so we can get sum money"; "Its no need for me to wait for u cuz i know you aint coming back cuz if u was u would have been came im just ready to come back n get on my mission to get me some money my car right n find me a new bitch a strong one"; and "So get up here then lets get all the money we can get so I can grind while im home." Subsequent text exchanges on September 3 – 4, 2019 discuss L.H. traveling by bus from Norfolk, VA to Washington, D.C. Through these messages, L.H. provided the DEFENDANT with the address of Union Station, located in Washington D.C., and informed him that she would arrive at 1:30 a.m. on the morning of September 5, 2019. A text message exchange, which occurred on September 5, 2019 at approximately 4:25 a.m., reads as follows:

> DEFENDANT: Walk down 2 12
> DEFENDANT: Move on the outskirts
> L.H.: OK what u seen police harassing[1]

Data collected from the phones belonging to DEFENDANT and L.H. show that they traveled from various parts of Virginia into the District of Columbia in order for L.H. to work on the Track on multiple occasions in October and November of 2019. For example, on November 3, 2019, the two were observed on or near the Track between approximately 3:00 a.m. and 7:00 a.m. On November 4, 2019, members of the CEHTTF conducted surveillance on the track between approximately 6:00 a.m. to 7:30 a.m. Law enforcement observed L.H. near the intersection of 12th Street and M Street Northwest, and later observed the DEFENDANT driving a car near the south edge of Logan Circle. On November 5, 2019, at approximately 5:00 a.m., law enforcement observed the DEFENDANT driving the same vehicle near the intersection of 14th and Rhode Island Avenue Northwest. At the time of his arrest, the DEFENDANT had $1,204 in cash on his

---

[1] All text abbreviations and typographical errors in quoted text appear as they do in the original evidence.

person. He was also in possession of a cellular telephone at the time of his arrest, which was seized and searched pursuant to a warrant.

On November 5, 2019, law enforcement interviewed L.H. During this interview, she stated that she had known the DEFENDANT since she was 8 years old. L.H. stated that she knew the DEFENDANT from the neighborhood, that she knew that he was a pimp, and that he had a reputation for beating women. She stated that she first "hooked up" with the DEFENDANT shortly after Thanksgiving 2018. L.H. stated that she knew that the DEFENDANT used J.J. to engage in commercial sex for his financial gain. She also informed law enforcement that the DEFENDANT would drive her from Norfolk, VA to Washington, D.C., in order to engage in commercial sex work, and then the DEFENDANT would drive her back to Norfolk. L.H. admitted that she had been with WILKINS in Washington, D.C. around the time of her arrest (in September of 2019), and that they had traveled from Norfolk to Washington, D.C. two subsequent times in order for L.H.to engage in prostitution. L.H. stated that she engaged in commercial sex work on the Track while in Washington, D.C.

L.H. explained that the DEFENDANT "showed her the ropes" of engaging in commercial sex work in Washington, D.C. Furthermore, during this interview, L.H. identified herself as the woman the DEFENDANT assaulted in August 2019, which was captured on a local resident's security surveillance device – as detailed above. She also informed law enforcement that this was not the only time that the DEFENDANT had been physically violent with her.

As the investigation continued, law enforcement located other women that this DEFENDANT sexually exploited for his financial gain. One of these victims, J.J., met the DEFENDANT over a decade ago inside a club in Norfolk. According to J.J., and consistent with

the statements of other witnesses, the DEFENDANT was a drug dealer at this time. The DEFENDANT took advantage of this victim's financial situation, and began to provide her with money and other forms of assistance, appearing to do so out of the "goodness of his heart". However, this changed over the course of several months and the DEFENDANT explained that J.J. was going to engage in commercial sex acts as a way to earn money for him. The DEFENDANT began to drive J.J. from Norfolk, VA to Washington, D.C. so that she could work on the Track.

The DEFENDANT was incredibly violent towards J.J. He repeatedly used physical violence as a means of maintaining control over her, to ensure that she continued to engage in commercial sex acts for his financial benefit. On one occasion, an altercation inside a hotel room in North Carolina escalated into a physical confrontation. During the assault, J.J. was knocked unconscious and later woke up in a hospital in Atlanta, Georgia. As a result of this assault, J.J. suffered a severe eye injury and a fractured finger. Despite these injuries, the DEFENDANT was able to track J.J. down, and coerced her into continuing her life in commercial sex work.

This was not the only time in which the DEFENDANT seriously injured J.J. He also beat her inside a hotel room in Charlottesville, VA. A verbal altercation over the fact that the DEFENDANT spent all of the money that J.J. earned turned physical. The DEFENDANT repeatedly punched her in the face, pushed her into the hotel furniture, and stomped on her leg. An individual at the hotel called the police, and the defendant was arrested. Law enforcement records confirm that, on January 10, 2013, police officers responded to a Quality Inn Hotel located in Charlottesville, VA. Law enforcement observed the following injuries to J.J.: swelling to the left eye and eyebrow; heavy swelling to the right eye/eyebrow; bloodshot eyes; a red mark to her

neck; and bruising to the outside of her right leg and upper thigh. The DEFENDANT was arrested and subsequently pled guilty to Assault on a Family Member as a result of this incident.

O.R. met the defendant in late 2014. In early 2015, she went to a Red Roof Inn, located in Virginia Beach, with the DEFENDANT. Both O.R. and J.J. were working for the DEFENDANT inside this hotel. During this time, the DEFENDANT took photographs of the two women, posed provocatively in lingerie, and he used these sexually explicit photographs in online advertisements, offering the women up for commercial sex. When the victims were engaging in the commercial sex acts, the DEFENDANT would be outside of the hotel room, typically in the parking lot inside his vehicle. In fact, law enforcement records confirm that, on one occasion in January 2015, the DEFENDANT was arrested inside a vehicle in the parking lot of the Red Roof Inn. When officers approached his car, the DEFENDANT was seen putting something into his mouth, and deleting information from his phone.

Between January of 2015 and November 2017, the DEFENDANT repeatedly drove J.J. and O.R. from various parts of Virginia, including the Norfolk area, to Washington, D.C. for the purposes of prostitution. The defendant would take them to work on the Track. O.R. estimates that this happened at least 15-20 times during this time period. She also stated that they would stay in hotels in the area while they were working on the Track.

O.R. lost touch with the DEFENDANT for a period of time following November 2017. However, the DEFENDANT reached out to her via Instagram in March of 2019. In a series of messages via Instagram, between March of 2019 and July or 2019, the DEFENDANT repeatedly attempted to induce, persuade, and coerce O.R. to travel from Norfolk VA, to Washington, D.C., for the purposes of engaging in prostitution for his benefit. For example, on May 18, 2019, the DEFENDANT sent her a message which reads, "Hey bitch u need stop playing

like u gangsta bitch n come on back home to daddy!  7572755031 u know I think bout u all da time u get of dat square ass shit us on n com back home."    The next day the DEFENDANT wrote to, "U was real solid u never said a word u stucked to the H-code like a real bitch should n whenever you come back I have a top spot."  On June 10, 2019, the DEFENDANT sent a message stating, "U looking good tho baby can I borrow u for the weekend?"

In July of 2019, the DEFENDANT sent O.R. messages, indicating that he had another woman engaging in commercial sex work for his financial gain.  The investigation has revealed that the woman he was referring to was L.H.  In July of 2019, the DEFENDANT, driving a Cadillac, transported L.H. and O.R. from the Virginia Beach area of Virginia to Washington, D.C. for the purpose of engaging in prostitution. The DEFENDANT took both of the women to the Track.  O.R. stated that she and L.H. engaged in commercial sex acts and that both women gave money that they earned to the DEFENDANT.  After staying in the Washington, D.C. area, the DEFENDANT drove the victims back to Virginia.

The Government has obtained jail calls the DEFENDANT has placed to one of the victims in this case, L.H., between November of 2020 and January of 2021.  Throughout these calls, the DEFENDANT continually questions L.H. about her communications with the Government, asking "Has the Government been down on your ass, man?"  When L.H. responds affirmatively, the DEFENDANT asks L.H., "What did they say?"  As the conversation progresses, L.H. tells the DEFENDANT that she has to go to Court on December 2nd.  In response, the DEFENDANT says, "Bitch, you coming?" The DEFENDANT tells L.H. that he can "see" everything that she has already said to law enforcement, and says that, "If don't nobody come to court, then they got to let me go, man.  You know what I'm saying?"  As this call ends, the

DEFENDANT instructs L.H., "I want you to talk to my lawyer, right. I'm going to try to get him to get you to sign the affidavit. Shit like that."

In another call, the DEFENDANT asks L.H. repeatedly about whether or not she provided consent to law enforcement to search her cellular phone. The DEFENDANT tells L.H. that, "the reason why I'm locked up is because of the text messages on the phone." He questions L.H. about statements that she made during interview with law enforcement, asking if she told law enforcement, "that I was your pimp, my name was Lucky, and that you known me a week." The Government is in the process of obtaining additional jail calls placed by the DEFENDANT and it is possible that the DEFENDANT's ongoing conduct could lead to additional charges related to Obstruction of Justice and/or Tampering with a Witness. Even without additional charges, the DEFENDANT's persistent efforts to contact and communicate with the victims in this case, particularly with L.H., demonstrate his persistent desire to interfere with the investigation and prosecution in this case, by influencing or attempting to prevent the testimony of one of the Government's witnesses. *See* 18 U.S.C. §§1591(d) and 1512(b)(2). As such, the Government is asking that this Court issue an Order, directing the DEFENDANT not to have contact with the victims and witnesses in this case until the conclusion of the trial.

## LEGAL STANDARD

18 U.S.C. § 3771(a)(8) provides that a crime victim has the "right to be treated with fairness and with respect for the victim's dignity and privacy." Further, "the attorney for the Government may assert the rights" afforded to a victim under the Crime Victims' Rights Act. *See* 18 U.S.C. § 3771(d)(1). A crime victims' rights "shall be asserted in the district court in which a defendant is being prosecuted for the crime, [and] . . . [t]he district court shall take up and decide any motion asserting a victim's rights forthwith." *See* 18 U.S.C. § 3771(d)(3). Crime victim is defined as "a person directly

and proximately harmed as a result of the commission of a Federal offense." *See* 18 U.S.C. § 3771(e)(2)(A).

18 U.S.C. § 1514(b)(1) provides that this Court, "upon application of the attorney for the Government, or its own motion, shall issue a protective order prohibiting harassment of a victim . . . in a Federal criminal case . . . if the court, after a hearing, finds by a preponderance of the evidence that harassment of an identified victim . . . in a Federal criminal case . . . exists or that such order is necessary to prevent and restrain an offense under section 1512 of this title . . ." "The court shall set the duration of effect of the protective order for such period as the court determines necessary to prevent harassment of the victim or witness but in no case for a period in excess of three years from the date of such order's issuance."   *See* 18 U.S.C. § 1514(b)(5).

"Harassment" is defined as "a serious act or course of conduct directed at a specific person that—(i) causes substantial emotional distress in such person; and (ii) serves no legitimate purpose." *See* 18 U.S.C. § 1514(d)(1)(B). "Course of conduct" is defined as "a series of acts over a period of time, however short, indicating a continuity of purpose" while "'serious act' means a single act of threatening, retaliatory, harassing, or violent conduct that is reasonably likely to influence the willingness of a victim . . . to testify or participate in a Federal crime case. . . ." *See* 18 U.S.C. § 1514(b)(1)(A) & (F).

## **ARGUMENT**

The Government is well within its purview to seek this relief on the victims' behalf. The DEFENDANT is charged with two counts of Sex Trafficking by means of Force, Fraud or Coercion, as well as various other offenses, including the physical assault of L.H. The dynamics between the offenders who perpetrate these crimes and the victims that they exploit are complex and can be difficult for the jury to understand. At trial, the Government will introduce expert testimony on the various methods that offenders use in order to recruit, entice, and

manipulate victims – as well as the various means that they employ to maintain their control and ensure the victims' compliance.  The jury will hear evidence regarding what makes these victims particularly vulnerable to these tactics, and why they are often unable to leave the exploitative situation that they are in.  In the present case, this offender's panoply of tactics can be seen in the evidence that will be presented in court; from the various text messages that he sent to the victims to the acts of physical abuse he perpetrated against him.  While it may seem that these victims would be free from the DEFENDANT's coercive control now that he is incarcerated, his ongoing conduct proves the exact opposite.   Even as he is facing serious criminal charges, that carry a mandatory minimum penalty of fifteen years imprisonment, the DEFEDNANT is still continuing his efforts to manipulate, pressure, and control his victims.  This DEFENDANT knows, based upon the charging documents and the discovery that has been provided to him, who the Government intends to call as witnesses at trial.  In response, he has repeatedly contacted one of these testifying witnesses in an attempt to either influence her testimony, or to ensure that she will evade legal process and not testify at all.  *See* 18 U.S.C. §1512(b)(2).   In light of this offender's tactics, the Government's remedy is to seek a protective order, directing the DEFENDANT to not have any contact with the victims and witnesses in this case until the conclusion of the trial.  18 U.S.C. §1514(b)(1).

## CONCLUSION

The government requests that this Court PROHIBIT the DEFENDANT from having any direct or indirect contact, including through third parties, with the victims and the witness in this case between now and the conclusion of trial in this matter.  The prohibition should include no contact via email, telephone, online chats, social media websites, U.S. Mail, through third parties, or by any other means.

It is clear that neither the rules found in the United States Criminal Code, nor those imposed by the jail in which the DEFENDANT is currently housed are sufficient to prohibit this DEFENDANT from continually contacting and attempting to manipulate and influence a victim and witness in the case currently pending before this Court.  Therefore, an order from this Court prohibiting any contact is necessary.  Such an order prohibiting DEFENDANT's contact with victims and witnesses in the pending case is not prejudicial to the DEFENDANT.  His counsel and defense investigators can contact these victim and witnesses, who may – or may not- choose to speak with the defense team.[2]

Respectfully submitted,

CHANNING D. PHILLIPS
Acting United States Attorney
D.C. Bar. No. 415793


  /s/  Amy E. Larson
Amy E. Larson, N.Y. Bar Number 4108221
Assistant United States Attorney
555 Fourth Street, N.W.
Washington, D.C. 20530
Telephone: (202) 252-7863
Email: Amy.Larson2@usdoj.gov

---

[2] As noted above, J.J. and O.R. have both asked the Government to ask that the defense counsel and investigator refrain from coming to their homes, unannounced, as they have previously done.