## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | |
| | : | **Case No. 19-CR-390 (RC)** |
| **MICHAEL JABAAR WILKINS,** | : | |
| | : | |
| **Defendant.** | : | |

## <u>GOVERNMENT'S MOTIONS IN LIMINE</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully files the following Motions in Limine.   This motion is based upon the files and records of this case together with the factual background statement and the following points and authorities.

I.        **Supplemental 404(b) Notice**

Pursuant to Federal Rules of Evidence 404(b), the Government is providing pretrial notice of the Defendant's Crimes, Wrongs or Other Acts.

### A.   Newly Discovered Witness to, and Victim of, the Defendant's Exploitation

As this Court is well-aware, the Metropolitan Police Department of the District of Columbia ("MPD") and the FBI Child Exploitation and Human Trafficking Task Force ("CEHTTF") have been actively investigating an area of Washington, DC, near the Logan Circle neighborhood, which has been subjected to the ongoing violence and criminal conduct that is brought to the area by the ongoing commercial sexual exploitation of women.

On July 2, 2021, the Government first interviewed a witness, who will be referred to as C.W., who has known the Defendant for nearly a decade.   During this interview, C.W. stated that she is the cousin of J.J, who is a named victim in the Superseding Indictment.   The Government will introduce testimony from C.W. about her observations of the Defendant's relationship with J.J.

Additionally, C.W. will testify that when she first met the Defendant, he was the one who sold her crack cocaine and heroin.   Over time, the Defendant began to transport C.W., along with J.J., to various hotels in the Norfolk, VA, and from Virginia to the "Track" in D.C., so that she could engage in commercial sex acts for his financial gain.   The Defendant took all of the money that J.J. and C.W. made engaging in commercial sex.   He also supplied C.W. with heroin and crack cocaine.   This constant drug supply was the reason that C.W. worked for the Defendant.

C.W. will corroborate J.J.'s testimony that the Defendant drove the women from the Norfolk, VA area to D.C. in a burgundy Jaguar.   She will testify that it was the Defendant who set the price for the commercial sex acts and who would dictate a quota for the night.   C.W. was with J.J. on the Track, and she will testify what it was like to work on the strip and to turn the money she made directly over to the Defendant.   Like other witnesses, C.W. will testify that the Defendant always carried a gun with him.   She believes that this gun was a 9mm pistol or a 40-caliber pistol.   In part because of his access to deadly firearms, and also because of his threats to harm her, C.W. always followed the Defendant's "rules." She was fearful that if she did not, she would get an "ass whooping."

C.W.'s testimony is also relevant because she knew O.R., who is another victim specifically named in the Superseding Indictment.   She will testify that they were both staying

2

at the same location when they were struggling with drug addiction.    It was C.W. who first introduced O.R. to the Defendant.    C.W. will testify that the Defendant transported her and O.R. to a hotel in the Norfolk, VA area so that they could engage in commercial sex acts for his financial benefit.

### B.    The Defendant's Use of Social Media to Recruit Women

The Government will present portions of the Defendant's social media accounts, including Instagram, which he used in order to coerce and entice both O.R. and L.H. to travel from Virginia to Washington, D.C. in order to engage in commercial sex acts for his financial gain.    The Government is also aware that the Defendant used his Instagram account in an effort to recruit other women for the same purpose.

For example, during the time period charged in the Superseding Indictment, in July of 2019, the Defendant started messaging a woman using the Instagram handle "queen_pettyyyyy." In an effort to recruit her to "work" for him, the Defendant wrote, "U need to stop playing n treat yourself instead of cheating urself if u Digg what I'm saying" and "U need to do urself a favor n switch ur flavor 2gs n I'll elevate your game bitch!"   When faced with an unfavorable reply, the Defendant responded, "Just keep that in mind hoe." In portions of this exchange, the Defendant discussed one of the women that is currently working for him, who the Government knows is L.H.   Between February and March of 2018, also within the time period charged in the Superseding Indictment, the Defendant attempted to recruit another woman using the Instagram handle "where_intheworld_is_skydeigo."   In this exchange, the Defendant wrote, "How u doing lovely u have any folks I'm really digging u right now Lucky Charm for the money n the record but don't forget the money first I'm the best thing since Listerine n ice cream I'm a real hoes

dream."    The Defendant used his Instagram account to message dozens of women in an effort to recruit them into the life of commercial sexual exploitation.   While the Government does not intend to introduce each and every one of these solicitations, it intends to offer nine of them into evidence at trial.1

### C. Additional Facts Regarding the Defendant's Drug Convictions Involving the Same Drugs He Supplied to His Victims

The Government previously sought to admit into evidence the Defendant's following arrests and convictions:    The defendant's December 10, 2011 arrest for Possession with Intent to Distribute Cocaine, in Washington, DC; his January 22, 2015 arrest and later conviction of Possession of Marijuana, from the Virginia Beach Circuit Court, VA; and his November 10, 2015 arrest and later conviction for Possession With Intent to Distribute Cocaine, from the Chesapeake Circuit Court, VA.

Regarding the December 2011 incident, the Defendant was arrested in Washington, D.C., in the vicinity of 1601 New York Avenue NE, for Possession with Intent to Distribute cocaine. Prior to his arrest, the Defendant was observed talking to two women who were engaging in commercial sex work on the corner of 16th and New York Avenue.   Law enforcement observed the Defendant drive into the parking lot of the Comfort Inn, located at 1601 New York Avenue NE, Washington, D.C. A search of the vehicle revealed cocaine in the driver's side door panel.

In January of 2015, a police officer found the Defendant sleeping inside a car parked in the parking lot of a Red Roof Inn in Virginia Beach.   When officers approached, the Defendant began putting things in his mouth, and deleting items off his phone.   When the Defendant opened the

---

1These have been provided to the Court and defense counsel and are labeled Government's Exhibit 49 A-I.

car door, pursuant to the officer's direction, the officer observed marijuana inside the vehicle. The Defendant was arrested and subsequently pled guilty to Possession of Marijuana.   O.R. was inside the hotel engaging in commercial sex acts for the Defendant's benefit at the time.

Finally, in November 2015, law enforcement was called to a hotel in Chesapeake, Virginia, where they observed a silver Cadillac parked outside.   When they approached the car, they smelled marijuana and found drugs not only inside the vehicle, but officers also found heroin, cocaine, and marijuana inside the Defendant's rectum. The Defendant told the arresting officer that he was the at the hotel with his girlfriend because their home was being fumigated.   One of the victims specifically named in the Superseding Indictment, O.R., was the woman the Defendant was referring to.   O.R. exited the hotel and spoke to law enforcement at the time of the Defendant's arrest.

At the time of the original 404(b) Notice, the Government had not met with C.W., and therefore did not know that the Defendant would supply her with crack cocaine during the time that he sexually exploited her, which was during the same time period as his 2011 arrest for Possession with Intent to Distribute Cocaine, and his November 2015 conviction for Possession with Intent to Distribute Cocaine    Additionally, while the Government was aware that the Defendant obtained and supplied O.R. with heroin while she was working for him, until the recent receipt of the Arrest Report from the November 2015 arrest, the Government was not aware that the Defendant had not only cocaine, but also heroin and marijuana in his possession. Finally, the Government has confirmed with both J.J. and O.R., who were being exploited by the Defendant in January of 2015, that the Defendant would supply them with marijuana when they were engaging in commercial sex acts for his financial benefit.   As such, the Government

renews its request to admit evidence of these prior arrests and convictions, because these prior law enforcement interactions demonstrate his possession of the specific drugs that he provided to the victims during not only the same time period, but also during two specific dates when one of the victims was with him.   As such, this evidence is admissible to corroborate the veracity of the victims' testimony.   *See* Court's Memorandum Opinion, Dkt. No. 81 at page 26.

### D.   This Evidence Proffered is Admissible

### 1.   The Proposed Statements in Text and Instagram Messages Are Admissible Under Various Hearsay Exceptions.

The Defendant's statements in his Instagram messages are admissible as non-hearsay admissions of a party opponent.   *See* Fed. R. Evid. 801(d)(2)(A).   At trial, the Government will present "ample evidence from which the jury could conclude that the [messages were written by [the defendant], which suffices for purposes of Rule 801(d)(2)(A)."   *See United States v. Hassanshahi*, 195 F. Supp. 3d 35, 51 (D.D.C. 2016).   The statements made by the women the Defendant attempted to recruit are also admissible to "provide context for the defendant's statements and are not introduced for their truth."   *United States v. Safavian*, 435 F. Supp. 2d 36, 44 (D.D.C. 2006); *see also United States v. Thompson*, 279 F.3d 1043, 1047 (D.C. Cir. 2002) ("An out-of-court statement that is offered to show its effect on the hearer's mind," as opposed to for the truth of the matter asserted, "is not hearsay under Rule 801(c)." (citations omitted)).

### 2.   The Proffered Evidence Is Admissible as Intrinsic Evidence of the Charged Offenses or As Permissible 404(b) Evidence.

Rule 404(b) discusses certain inadmissible evidence and provides, in pertinent part:

> Evidence of other crimes, wrongs, or acts is not admissible to prove
> the character of a person in order to show action in conformity

> therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident ....

Fed. R. Evid. 404(b).    Rule 404(b) provides that evidence of "other crimes, wrongs, or acts" is not admissible to prove a defendant's character but is admissible for any non-propensity purpose, such as to demonstrate motive, intent, plan, knowledge or absence of mistake.    *See Bowie*, 232 F.3d at 926, 930; *see also Huddleston v. United States*, 485 U.S. 681, 685 (1988) (noting that evidence of extrinsic acts is admissible and, in fact, "may be critical, . . . especially when th[e] issue involved the actor's state of mind and the only means of ascertaining that mental state is by drawing inferences from conduct").    Importantly, this rule is one of "inclusion rather than exclusion."    *Bowie*, 232 F.3d at 929; *see also, e.g.*, *United States v. Ellisor*, 522 F.3d 1255, 1267 (11th Cir. 2008) (citations omitted).    As the D.C. Circuit stated in *United States v. Cassell*, "the evidence may tend to show that [defendant] is a person of bad character, but Rule 404(b) does not thereby render it inadmissible. To reiterate what we have stated before . . . under Rule 404(b), 'any purpose for which bad acts evidence is introduced is a proper purpose so long as the evidence is not offered solely to prove character.'"    292 F.3d 788, 795 (D.C. Cir. 2002) (citing *United States v. Miller*, 895 F.2d 1431, 1436 (D.C. Cir. 1990)).    The Government need only establish "similarity and some connection" between the 404(b) evidence it seeks to admit and the current case for the evidence set forth above to be admissible.    *United States v. Long*, 328 F.3d 655, 663 (D.C. Cir. 2003) (noting that other crimes evidence need only meet a "threshold level of similarity" to constitute proof of intent); *United States v. Brand*, 467 F.3d 179, 197 (2d Cir. 2006) (government is required only to show a "similarity or some connection" to establish that a prior act is relevant to intent).

All evidence, including evidence admissible under Rule 404(b), is subject to the strictures of Rule 403.   Thus, the admissibility of other crimes or bad acts evidence rests on a two-step inquiry: 1) whether the evidence is relevant to an issue in the case, *see* Fed. R. Evid. 404(b); and, if so, 2) whether the evidence is admissible under Rule 403 because its probative value is not substantially outweighed by the danger of unfair prejudice.   As its language reflects, Rule 403 "tilts, as do the rules as a whole, toward the admission of evidence in close cases."   *See United States v. Moore*, 732 F.2d 983, 987, 989 (D.C. Cir. 1984); *Huddleston*, 485 U.S. at 688-89 ("Congress was not nearly so concerned with the potential prejudicial effect of Rule 404(b) evidence as it was with ensuring that restrictions would not be placed on the admission of such evidence.").

## A.   The Expected Testimony of C.W. Is Admissible Intrinsic and 404(b) Evidence.

C.W.'s testimony is direct evidence of the Defendant's charged crimes because she was present when the Defendant transported J.J. across state lines, from Norfolk, VA to Washington, D.C. for J.J. to engage in commercial sex acts for his benefit.   Similarly, she was the one who introduced the Defendant to O.R., and she was present inside a hotel room in Norfolk when O.R. was engaging in commercial sex acts for the Defendant's financial gain.   To the extent that the fact that the Defendant also transported C.W. across state lines in order for her to engage in prostitution, and supplied her with cocaine, is considered evidence of another crime, wrong, or bad act, this evidence is admissible to show the Defendant's motive, opportunity, intent, knowledge and absence of mistake or accident with respect to the crimes charged in the Superseding Indictment.   *See* FRE 404(b); *see also United States v. Washington*, 810 F. App'x 478, 480 (8th Cir. 2020) (affirming district court's admission of defendant's pandering conviction under

8

Rule 404(b) after finding "evidence was relevant to knowledge and intent, was factually similar, and was close enough in time to be admitted").   C.W.'s testimony that the Defendant had access to firearms during the time period charged in the Superseding Indictment "goes directly to a possible coercive scheme he used to accomplish a key element of the charged offenses" and thus is intrinsic evidence.   *See* Court's Mem. Op. 22.

The Defendant's Instagram messages in which he attempts to recruit women into the life of commercial sexual exploitation are admissible pursuant to FRE 404(b).   These messages are admissible because they help demonstrate the Defendant's motive, and rebut any claim of innocent explanation or mistake regarding the crimes that he is charged with in the Superseding Indictment, which includes knowingly persuading, inducing, or enticing an individual to travel in interstate commerce for the purpose of engaging in prostitution. As such, these Instagram messages serve as highly probative evidence relating to the "question of Mr. Wilkin's knowledge and intent regarding the crimes that he is charged with." *Id.* at 34.

Finally, the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice to the defendant.   To minimize the danger of any unfair prejudice, the Court can give an extensive limiting instruction.   Courts routinely recognize that such limited instructions "ordinarily suffice to protect the defendant's interests."   *Long*, 328 F.3d at 662 (citing *Spencer v. Texas*, 385 U.S. 554, 561 (1967)).   Thus, the Court should grant the Government's motion and admit the proposed evidence in its entirety.

## II.      Introduction of Evidence Pursuant to Federal Rule of Evidence 803(4)

All relevant evidence is admissible, except as provided by the Constitution of the United States, by Act of Congress, by the Federal Rules of Evidence, or by other rules prescribed by the Supreme Court pursuant to statutory authority. *See* Fed. R. Evid. 402. Evidence is relevant if it tends to "make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."    *See* Fed. R. Evid. 401. As a general matter, out of court statements that are offered for the truth of the matter asserted are inadmissible. *See* Fed. R. Evid. 802. The Federal Rules of Evidence carve out exceptions to this rule. The following is not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness:

> (4) A statement that:
> (A) is made for—and is reasonably pertinent to—medical diagnosis or treatment; and
> (B) describes medical history; past or present symptoms or sensations; their inception; or their general cause.

*See* Fed. R. Evid. 803(4).

Fed. R. Evid. 803(4). Rule 803(4) allows for the admission of statements made for the purpose of medical diagnosis and treatment. *See United States v. Bercier*, 506 F.3d 625 (8th Cir., 2007) (holding that a victim's statement made to a nurse upon arrival at the emergency room that she had been assaulted was admissible under hearsay exception for statements made for purpose of obtaining medical diagnosis or treatment). These statements are considered trustworthy because they are, "by their nature, made for a purpose other than use in a prosecution." *Michigan v. Bryant*, 562 U.S. 344, 362 n.9 (2011). Statements made regarding the causation of injuries also have the same guarantee of trustworthiness. *See* Fed. R. Evid. 803(4), Notes of the Advisory Committee.

10

As such, the Government seeks to move *in limine* J.J's statements in medical records obtained from Emory Crawford Long Hospital in Atlanta, Georgia.[2]   When interviewed by law enforcement, J.J. stated that she the Defendant assaulted her inside a hotel room in North Carolina. According to J.J., the Defendant became angry because she did not make enough money engaging in commercial sex acts on the day of the incident. The Defendant instructed J.J. to make additional money and, when she refused, he struck her multiple times. J.J. reported that, as a result of the Defendant's actions, she lost consciousness. J.J. recalled waking up in a hospital in Atlanta, Georgia. As a result of this incident, J.J. sustained a serious injury to her right eye which has caused her to lose her vision in that eye. J.J. also sustained a fractured finger when trying to defend herself from the Defendant's vicious assault.

Testimony and evidence related to this incident is highly probative and relevant to the conduct charged in Count 1 of the Superseding Indictment. It is direct proof that the Defendant used physical force in an effort to cause J.J. to engage in commercial sex acts. The medical records from Emory Crawford Long Hospital document J.J.'s statements following this incident. Therefore, the Government seeks to move *in limine* for the admission of J.J.'s February 20, 2012, statements to a physician's assistant as documented in the records provided by Emory Crawford Long Hospital. Specifically, the Government seeks to admit the following statement:

> The patient presents to the emergency department and reports being assaulted and This is a 23 y/o AAF who presents to the ED with a c/o headache, dizziness, right eye redness and left hand pain secondary to being assaulted today by her boyfriend. Patient says that she was visiting her boyfriend in South Carolina and he became upset with her and began to hit her in the head with a closed fist continuously. Patient says that she tried to block the blows with her left hand and now she has pain in her index finger….Patient says that she thinks her contact lens has rolled in the back of her eye, because she can't find it. She says her main

---

2  The Government has provided a portion of these records to the Court as Government's Exhibit 31.

concern is her head because the boyfriend was hitting her repeatedly. The degree of pain is moderate.

Emory Crawford Long Hospital Records, p. 2

[S]tates she was assaulted at 1500 today in South Carolina, states she was punched over 100 times in the head, her right eye is red but her main c/o is headache….

Emory Crawford Long Hospital Records, p. 9

Each of these statements is relevant to J.J's diagnosis and treatment in the emergency department. J.J.'s statements that she was assaulted by her boyfriend, that he hit her in the head continuously with a closed fist, and that she tried to defend herself are all relevant to the kinds of injuries she sustained and the treatment she required. J.J.'s statement that these events occurred in South Carolina made her treating physician aware of the time that had elapsed between the incident and her admission to the hospital, which is relevant to the type of treatment she should/would receive. Statements related to the number of blows J.J. sustained are related to the severity of her injuries. It can reasonably be inferred that J.J.'s statements regarding her contact lens, the pain in her index finger, and her concern about her head due to the multiple blows she sustained were made to direct her treating physician's attention to those issues so she could receive the proper treatment. Because each of these statements relate to the types of injuries J.J. sustained, and the timing of those injuries, they fall under the exception carved out in 803(4) as statements made for the purpose of medical diagnosis and treatment. Fed. R. Evid. 803(4). As such, the Government is seeking to admit this portion of the medical records into evidence at trial.

12

**III.     The Government May Move to Admit Prior Consistent Statements**

As the trial has not yet begun, the Government does not have a specific request to admit any prior statements that are consistent with a particular witness's testimony.   However, during the course of the trial, the Government may seek to introduce prior statements made by a witness that is consistent with that witness's testimony and is offered to (1) rebut an express or implied charge that the witness recently fabricated it or acted from a recent improper influence or motive in so testifying or (2) to rehabilitate the witness's credibility when attacked on another ground. *See* Fed. R. Evid. 801(d)(1)(B).

**A.  There are no Confrontation Clause Concerns**

There are no Confrontation Clause concerns presented by this evidence, because the witness will have testified at trial and will be cross-examined. *See Crawford v. Washington*, 541 U.S. 36, 59 n.9 (2004) (stating that "when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements" and "[t]he Clause does not bar admission of a statement so long as the declarant is present at trial to defend or explain it"); *Cookson v. Schwartz*, 556 F.3d 647, 650-52 (7th Cir. 2009) (admission of victim's hearsay statements to detective did not violate Confrontation Clause because victim was cross-examined regarding statements, which she did not recall making); *United States v. NB*, 59 F.3d 771, 775 (8th Cir. 1994) (affirming admission of victim's statements to social workers and stating that "when the child whose hearsay testimony is admitted also testifies himself or herself, the only Confrontation Clause issue is whether 'the trial provided an opportunity for effective cross-examination'") (quoting *Dolny v. Erickson*, 32 F.3d 381, 385 (8th Cir. 1994)); *United States v. Spotted War Bonnet*, 933 F.2d 1471, 1473 (8th Cir. 1991) (holding that the Confrontation Clause

"is satisfied when the hearsay declarants . . . actually appear in court and testify in person" and stating that "a perfectly satisfactory cross-examination is not required by the Clause, and a witness who cannot remember the details of statements she has made in the past can still be sufficiently available for cross-examination to satisfy the constitutional requirement") (citing *United States v. Owens*, 484 U.S. 554 (1988)).

As explained in *Crawford*, the "[Confrontation] Clause does not bar the admission of a statement so long as the declarant is present at trial to defend or explain it." *Crawford*, 541 U.S. at 1369 n.24. That the witness may be unwilling or unable to fully recount the events surrounding her victimization is of no Confrontation Clause significance, because the "Confrontation Clause guarantees only an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *United States v. Owens*, 108 S. Ct. 838, 842 (1988) (internal citations and quotations omitted). Indeed, *Owens* held that the Confrontation Clause was not violated by the admission of an assault victim's earlier out-of-court statement identifying his assailant even though the victim, due to memory impairment, was unable to recall for the jury who had struck him when he testified at trial. In key contrast, the assault victim in *Crawford* did <u>not</u> testify at trial because she invoked the marital privilege, thereby causing the Confrontation Clause difficulties.

Before the Government will seek to admit a prior consistent statement, the witness will have testified and will be made available for cross-examination.   Therefore, under *Crawford* and its progeny, there is no Confrontation Clause problem that prohibits the admission of such a prior consistent statement.

### B.  Rule 801(d)(1)(B)(ii) Permits the Admission of Prior Consistent Statements

Pursuant to Rule 801(d)(1)(B)(ii), a statement is not hearsay if (1) the declarant testifies and is subject to cross-examination about a prior statement; (2) the statement is consistent with the declarant's testimony; and (3) the statement is offered to rehabilitate the declarant's credibility when attacked on another ground. *See* Fed. R. Evid. 801(d)(1)(B)(ii).   Subsection (ii) was added, effective December 1, 2014, to include another basis by which a prior consistent statement can be admitted: "to rehabilitate the declarant's credibility as a witness when attacked on another ground." Fed. R. Evid. 801(d)(1)(B)(i)(ii); *see also United States v. Slatten*, 395 F. Supp. 3d 45, 87 (D.D.C. 2019); *Williams v. Devlin*, No. CV 12-1659 (CKK), 2015 WL 13668722, at *6 (D.D.C. Oct. 22, 2015). As the Advisory Committee Notes explain, "[t]he intent of the amendment is to extend substantive effect to consistent statements that rebut other attacks on a witness – such as the charges of inconsistency or faulty memory."

This Rule preserves the Supreme Court's pre-motive rule in *Tome v. United States*, 513 U.S. 150 (1995), "as to consistent statements offered to rebut a charge of bad motive, while properly expanding substantive [truth of the matter asserted] admissibility to statements offered to rehabilitate on other grounds." *Memorandum from Advisory Committee on Evidence Rules for Standing Committee on Rules of Practice and Procedure, Judicial Conference of the United States* (May 7, 2013) (hereinafter "Advisory Committee Memo"), available at http://www.uscourts.gov/rules-policies/archives/committee-reports/advisory-committee-rules-evidence-may-2013 (last accessed July 21, 2015).

Indeed, courts in the District of Columbia allowed the admissibility of a prior consistent statement as substantive evidence when the statement is offered to "rehabilitate the declarant's

credibility as a witness when attacked on another ground" even before the 2014 amendment.   In *Rease v. United States*, 403 A.2d 322, 327-28 (D.C. 1979), the court noted that prior consistent statements could be admitted "for rehabilitation purposes" where they "can be of very clear help to the factfinder in determining whether the witness is truthful" and where the proposed evidence "is directed only at the particular impeachment that occurred." 3 Subsequently, in *Johnson v. United States,* 434 A.2d 415 (D.C. 1981), the court articulated much the same evidentiary standard in sustaining a trial court's admittance of a prior consistent statement where the witness had been impeached specifically by a prior inconsistent statement, saying: "[T]here is 'the corollary principle [to the general rule of exclusion] that a prior consistent statement . . . may be introduced into evidence to rehabilitate a witness.' *United States v. Smith,* 160 U.S. App. D.C. 221, 225, 490 F.2d 789, 790 (1974) (footnote omitted). Such rehabilitation is permissible when the witness' credibility has been challenged, *Rease v. United States, supra,* 403 A.2d at 328 n. 7, whether by impeachment with a prior inconsistent statement or by implication that the witness has a motive to lie." *Id.* at 420–21 (bracketed addition in original; citations omitted). It makes no difference whether the attack is express or implied.   *See U.S. v. Montague*, 958 F.2d 1094, 1096 (D.C. Cir. 1992) (where defense suggests by cross that witness hopes for clemency, tactic "constitutes at least an implied charge of improper motive" paving way for consistent statement).

However, more generally, before the 2014 amendments to Rule 801(d)(1)(B), consistent statements offered to rebut charges of recent fabrication or improper motive were substantively admissible. *See* Fed. R. Evid. 801(d)(1)(B), 2014 Advisory Committee Notes. In other words, the

---

3 Subsequent cases have generally recited the *Rease* analysis. *See, e.g., Battle v. United States,* 630 A.2d 211, 215–16 (D.C. 1993).

Rule did not "provide for substantive [truth of the matter asserted] admissibility of consistent statements that are probative to explain what otherwise appears to be an inconsistency in the witness's testimony." Fed. R. Evid. 801 (Advisory Committee Notes – 2014 Amendments). Furthermore, the Rule did not "cover consistent statements that would be probative to rebut a charge of faulty memory." *Id.*   Moreover, prior to the 2014 amendment, when a prior consistent statement was admissible for rehabilitative purposes, but not admissible as substantive evidence, the court had to give a limiting instruction. *See United States v. Castillo*, 14 F.3d 802, 807 (2nd Cir. 1994) (finding that a prior consistent statement can be offered to rehabilitate the witness's credibility even though it is not admissible under rule 801(d)(1)(B) as long as a limiting instruction was given). This limiting instruction informed the jury that a prior consistent statement should not be considered for its truth. *Id*. Instead, the prior consistent statement could only be considered to rehabilitate the witness's testimony. *Id.*

After subpart (ii) was added in 2014, consistent statements that rebut other attacks on a witness—for example, "charges of inconsistency or faulty memory"—may be received as substantive evidence. *Id.*

Since the 2014 amendment to Rule 801(d)(1)(B), courts have admitted forensic interviews of victims as well as statements previously made by victims to rehabilitate those witnesses after cross-examination. For example, in *United States v. J.A.S., Jr.*, 862 F.3d 543 (6th Cir. 2017), the Sixth Circuit held that playing the video of a child's forensic interview, which was "largely consistent" with her trial testimony, was "plainly admissible" under Rule 801(d)(1)(B)(ii) after the defense attacked the child's testimony by "pointing out that some aspects of her trial testimony were new . . . and by highlighting some collateral points on which her testimony and her prior

descriptions supposedly differed." *Id.* at 545; *see also United States v. Finch*, 78 M.J. 781, 791 (A. Ct. Crim. App.), *review granted in part*, 79 M.J. 220 (C.A.A.F. 2019)*; United States v. Cox*, 871 F.3d 479, 487 (6th Cir. 2017) (upholding admission of child victim's previous statement to an agent under Rule 801(d)(1)(B)(ii) after defendant attacked child's purportedly faulty memory); *United States v. Counts*, No. 3:18-CR-00141, 2020 WL 598526, at *4 (D.N.D. Feb. 7, 2020); *Berry v. Beauvais,* No. 13-cv-2647, 2015 WL 5244892, *2–3, 2015 U.S. Dist. LEXIS 119974, *5-6 (D. Colo., Sept. 9, 2015); *United States v. Drift*, 2014 WL 4662505, at *1 (D. Minn. Sept. 19, 2014) (ruling child victim's prior statements to forensic interviewer and child's grandmother admissible under Rule 801(d)(1)(B)).

Likewise, consistent written statements may be admitted under Rule 801(d)(1)(B)(ii) after attacks on the witness's credibility. *See United States v. Slatten*, 395 F. Supp. 3d 45, 87 (D.D.C. 2019)*; see also United States v. Lepore*, No. 1:15-cr-367-WSD-JKL, 2016 WL 4473125, at *3-4 (N.D. Ga. Aug 25, 2016) ("If, at trial, Defendants attack [witness's] credibility on grounds other than a claimed recent fabrication or improper influence or motive, Rule 801(d)(1)(B)(ii) permits the Government to introduce [witness's] handwritten notes to rehabilitate his credibility."); *Walker v. Housing Auth.*, 2:13-cv-675-MHT and 2:13-cv-846-MHT, 2015 WL, at *1-2 (M.D. Ala. Feb. 25, 2015) (admitting plaintiff's prior written statements in EEOC intake questionnaire as a prior consistent statement under 801(d)(1)(B)).

At trial, the United States may seek to introduce prior statements made by witnesses to law enforcement, medical professionals, grand juries or juries. Depending on the nature of the trial testimony, the Government may seek a ruling that prior consistent statements be admitted under Rule 801(d)(1)(B)(ii).

**IV.      Witnesses Should Be Allowed To Testify Using Only Their First Names**

During the course of trial preparation, the United States has interviewed three civilian witnesses, all of whom request permission from the Court to testify using only their first names. These individuals are listed under the Civilian Witness Section of the Government's Witness List, number 6, 8 and 9.   Witness 6, referred to as C.W. above, will testify in detail about engaging in commercial sex acts for the Defendant's financial game. Witnesses 8 and 9 both witnessed the Defendant assault L.H., in August of 2019, and both fear for their physical safety should the Defendant learn their identities.   As such, the Government requests that these witnesses be allowed to withhold their full names from the public record.

**A.  U.S.C. § 3771**

The Crime Victims' Rights Act ("CVRA") was designed to protect victims' rights and ensure their involvement in the criminal justice process.   *See United States v. Moussaoui*, 483 F.3d 220, 234 (4th Cir. 2007); *Kenna v. U.S. Dist. Court*, 435 F.3d 1011, 1016 (9th Cir. 2006) ("The [CVRA] was enacted to make crime victims full participants in the criminal justice system."). The statute, Title 18, United States Code Section 3771, affords victims[4] with ten specific rights, including, "[t]he right to be reasonably protected from the accused[,]" "[t]he right to be reasonably heard at any public proceeding in the district court[,]" and "[t]he right to be treated...with respect for the victim's dignity and privacy."   18 U.S.C. §§ 3771(a)(1), (4), and (8); *see also United States*

---

[4] The CVRA "instructs the district court to look at the offense itself to determine the harmful effects the offense has on parties.   If the criminal behavior causes a party direct and proximate harmful effects, the party is a victim under the CVRA.   Under the plain language of the statute, a party may qualify as a victim, even though it may not have been the target of the crime, as long as it suffers harm as a result of the crime's commission." *United States v. Giraldo-Serna*, 118 F. Supp. 3d 377, 383 (D.D.C. 2015) (internal quotations and citations omitted).

*v. Monzel*, 641 F.3d 528, 533 (D.C. Cir. 2011) (noting that 18 U.S.C. § 3771(b)(1) directs the court to ensure that the crime victim is afforded the rights described in § 3771(a)).   In light of the nature of the ongoing course of criminal conduct that the Defendant engaged in, namely, the sex trafficking of four women, as well as the violent assault on a woman in broad daylight, and the psychological trauma and ongoing fear that these victims and witnesses have endured based on the Defendant's actions, an order prohibiting the use of the last names of these witnesses throughout the course of these proceedings is consistent with the purpose and spirit of the CVRA.

These witness's last names should be withheld to protect them from potential harassment, undue embarrassment, retaliation by the Defendant and other adverse consequences that may result from the nature of their anticipated testimony.   *See* 18 U.S.C. § 3771.   This limited protection requested by the Government is reasonable, necessary and appropriate to protect the victims' safety and well-being; avoid harassment and humiliation of the victims by the Defendant, the press and others; and to protect the safety of these witnesses.   Refraining from using the full names of victims at trial has been held to be a narrowly tailored measure that properly allows courts to protect victims' privacy rights from public exposure while preserving the defendant's right to fully prepare his case and cross-examine the witnesses against him. *See United States v. Jacobsen*, 785 F. Supp. 563, 569 (E.D. Va. 1992).   Put another way, "[t]he protection of victims of sex crimes from the trauma and embarrassment of public scrutiny justifies impoundment of the victims' identities." *United States v. Dobson*, 1987 WL 11147 at *5 (D. Mass. March 13, 1987) (citing *Press-Enterprise v. Superior Court*, 478 U.S. 1, 9 fn. 2 (1986)); *see also United States v. Kaufman*, 2005 U.S. Dist. LEXIS 23825 at *12 (D. Kan. Oct. 17, 2005) (prohibiting sketch artists from depicting the adult victims' likenesses based on the need expressed in §3771(a)(8) to protect the

"dignity, as well as the physical and psychological well-being, of mentally ill alleged crime victims who have been potentially exploited through extensive video recording of themselves engaged in bizarre sexual behavior").

Revealing the witness' full names in a courtroom open to the press and public would only compound the anxiety that they feel, a concern which is further heightened by the long memory of the internet. Protecting the victims' identities from disclosure, especially in C.W.'s case, is a compelling interest because the nature of their testimony is sensitive, and may cause them embarrassment and psychological harm if their identities are disclosed publicly. *See Lewis*, 2017 WL 750456 at *5. Furthermore, such practice is common in cases involving sex trafficking. *See, e.g.*, *United States v. Willoughby*, 742 F.3d 229, 232 (6th Cir. 2014) (referring to minor victim as "SW"); *United States v. Campbell*, 770 F.3d 556, 560 (7th Cir. 2014), *cert. denied*, 135 S. Ct. 1724 (2015) (noting that the four victims in a sex trafficking case "testified at trial under their real first names"); *United States v. Royal*, 442 Fed. Appx. 794, 795 n.1 (4th Cir. 2011) (instructing that the record refer to victims by first name only); *United States v. Marcus*, 628 F.3d 36, 45 (2d Cir. 2010) (adult sex trafficking case rejecting defendant's argument that the district court erred by permitting witnesses to testify by first name only); *United States v. Lewis*, 2017 WL 750456 *5 (S.D. Ga. Feb. 27, 2017) (granting government's motion to refer to victims by first name only and ordering redaction of the victims' full names from the transcript when read at *voir dire*); *United States v. Thompson*, No. 14-CR-228A, 2016 WL 1584382, at *7 (W.D.N.Y. Apr. 6, 2016) (finding that the government had a compelling interest in limiting identification of the victims given the anticipated explicit and sensitive nature of the evidence in the case); *United States v. Graham*, No. 14-CR-500 NSR, 2015 WL 6161292, at *10 (S.D.N.Y. Oct. 20, 2015) (identifying victims by their first names

because there was "a 'legitimate and substantial' interest in protecting them from 'likely adverse personal, professional and psychological consequences of publicly linking their identities' to their prior prostitution activity");  *United States v. Kelly*, No. 07-CR-374 (SJ), 2008 WL 5068820, at *1–2 (E.D.N.Y. July 10, 2008) (allowing adult witness to testify under her first name and first initial of her last name in a trial for sex trafficking); *United States v. Patkar*, 2008 WL 233062, *4-5 (D. Haw. Jan. 28, 2008) (citing § 3771(a)(8) to justify limiting the disclosure of documents that "would cause damage to the reputation of the [adult] victim" based on his "statutory right to be treated with fairness and with respect for his privacy"); *United States v. Paris*, No. CR 03:06-CR-64(CFD), 2007 WL 3124724, at *1 (D. Conn. Oct. 24, 2007) (granting motion to refer to child and adult victim-witnesses by their first names and first initial of their last names to protect their identities).

There is a very real risk of humiliation for C.W.  For witnesses 8 and 9, they witnessed a traumatic event in the neighborhood in which they live.  Thus, protecting their last names from public revelation in a courtroom is necessary under the CVRA to protect C.W.'s dignity and privacy, and to protect Witnesses 8's and 9's physical safety.  The Defendant's affinity for deadly weapons, his known association with others involved in commercial sexual exploitation, and his ongoing attempts to influence the testimony of witnesses only heightens these concerns. Allowing the witnesses to testify using only their first names such is necessary in order under the CVRA to reasonably protect these victims from the accused.  *See* 18 U.S.C. §§ 3771(a)(1), (4), and (8).

### B.  Confrontation Clause

The Confrontation Clause guarantees defendants in all federal and state criminal prosecutions the right to confront government witnesses testifying against them. *See California v. Green*, 399 U.S. 149, 173-74 (1970). This right, however, is not absolute. A defendant's rights under the Confrontation Clause must yield to accommodate other legitimate interests in the criminal trial process. *See Chambers v. Mississippi*, 410 U.S. 284 (1970). For instance, the Supreme Court has observed that there is "wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness's safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). More broadly, courts have found that the potential for reprisals, humiliation, or annoyance are sufficient to justify non-disclosure of personal identifying information by a witness. *See, e.g.*, *United States v. Celis*, 608 F.3d 818, 832-34 (D.C. Cir. 2010) (permitting witnesses to testify under pseudonyms at trial); *United States v. Navarro*, 737 F.2d 625, 633-34 (7th Cir. 1984) (cross-examination of an informant about his home address and current place of employment precluded); *United States v. Pepe*, 747 F.2d 632, 656 n.33 (11th Cir. 1984) (finding no error in precluding cross-examination about witnesses' home addresses); *United States v. Harris*, 501 F.2d 1, 9 (9th Cir. 1974) ("If the answer may subject the witness to harassment, humiliation, or danger, then nondisclosure of the witness' home address may be justifiable.").

In deciding whether to limit the scope of cross-examination, the court must balance the government's reasons for requesting such limitations against the defendant's interest in the full cross-examination of the witness. *See Alford v. United States*, 282 U.S. 687, 694 (1931); *Smith v.*

*Illinois*, 390 U.S. 129, 134 (1968) ("[I]f the question asked is one that is normally permissible, the State or the witness should at the very least come forward with some showing of why the witness must be excused from answering the question. The trial judge can then ascertain the interest of the defendant in the answer and exercise an informed discretion in making his ruling.").

In the trial context, courts have found that the potential for reprisals, humiliation, or annoyance are sufficient to justify nondisclosure of personal identifying information by a witness. As Judge Ross has summarized:

> In advancing the contention that the defendant's rights under the Confrontation Clause of the Sixth Amendment require full disclosure of the witnesses' names, place of employment, and home addresses, the defendant relies on *Smith v. Illinois*, 390 U.S. 129 (1968), and *Alford v. United States*, 282 U.S. 687 (1931). Taken together, these cases have been interpreted by the Second Circuit to safeguard two main interests of the defendant: (1) obtaining information needed for in-court and out-of-court investigation of the witness; and (2) enabling defense counsel to elicit information that might be relevant to the jury's deliberations as to the credibility or knowledgeability of the witness. *See United States v. Marti*, 421 F.2d 1263, 1266 (2d Cir. 1970). In the event the government seeks to limit disclosure of identifying information in open court, the government must provide a reason for the limitation. *Id.* (*citing Smith,* 390 U.S. at 134 (White, J., concurring)). "[T]he reason may be that the answer may subject the witness to reprisals or that the question is being used to humiliate or annoy the witness." *Id.* (citing Alford, 282 U.S. at 694). The defendant is then required to demonstrate a "particularized need" for disclosure of the relevant information, which the court weighs against the risks to the witness. *See United States v. Bennett*, 409 F.2d 888, 901 (2d Cir. 1969); *see also United States v. Cavallaro,* 553 F.2d 300, 305 (2d Cir. 1977).

*United States v. Marcus*, No. 05-CR-457 (ARR), 2007 WL 330388, at *1 (E.D.N.Y. Jan. 31, 2007).

In *Marcus*, the court relied in part on *United States v. Marti*, 421 F.2d 1263, 1266 (2d Cir. 1970), in which the Second Circuit analyzed the Supreme Court's holdings in *Smith* and *Alford*, and ultimately concluded that there was no prejudice to the defendant where he was precluded from inquiring about a witness's address, holding that although the government should come forward with a reason for withholding a witness's address, "the reason may be that the answer may

24

subject the witness to reprisals or that the question is being used to humiliate or annoy the witness."
*See Marcus*, 2007 WL 330388, at *1-2 (ruling that potential harassment, potential loss of
employment, and the explicit nature of anticipated testimony are legitimate reasons to protect
witnesses' full identity and to exclude mention of witnesses' home addresses, and current places
of employment); *accord United States v. Pepe*, 747 F.2d 632, 656 n.33 (11th Cir. 1984) (finding
no error in precluding cross-examination regarding witnesses' home addresses); *United States v.
Harris*, 501 F.2d 1, 9 (9th Cir. 1974) ("If the answer may subject the witness to harassment,
humiliation, or danger, then nondisclosure of the witness' home address may be justifiable.");
*United States v. Alston*, 460 F.2d 48, 51-52 (5th Cir. 1972). As the *Marcus* court concluded, the
relevant precedent looks to whether the information is necessary to the defendant in order to
engage in an in- or out-of-court investigation of the witness or to attempt discrediting the victim
before the jury.

In addition, several courts have upheld non-disclosure of full identifying information in
order to protect the safety of the witness and his or her family. *See, e.g., United States v. Watson*,
599 F.2d 1149, 1157 (2d Cir.), *amended on other grounds by* 690 F.2d 15 (2d Cir. 1979), 633 F.2d
1041 (2d Cir. 1980) (government witness in witness protection program permitted not to disclose
his occupation); *United States v. Baker*, 419 F.2d 83, 87 (2d Cir. 1969) (government witness
permitted to withhold name and address of current employer); *United States v. Persico*, 425 F.2d
1375, 1383-84 (2d Cir. 1970) (two government witnesses permitted to conceal addresses and
places of employment).

Where the government seeks to limit disclosure of a witness's identifying information in
court, the government must articulate a need for withholding the identifiers, such as fear of reprisal,

humiliation, or annoyance to the witness. As detailed above, the Government has done just that. Once the Government identifies a need to protect the witness' full identity, the defendant must demonstrate a "particularized need" for the information, which the Court weighs against the harm to the witness. *Marcus*, 2007 WL 330388, at *1. In *Marcus*, a case involving sex trafficking allegations, Judge Ross expressly found that "[i]n light of the explicit nature of the conduct that the witnesses will be testifying about . . . the court has determined that the witnesses' fear of harassment and reprisals is legitimate." 2007 WL 330388, at *1. Similarly, in another case, Judge Feuerstein also permitted victims testifying in graphic detail about acts of forced prostitution and sexual contact with customers and others to testify using their first names only. *See* Order dated April 26, 2011 at 2, *United States v. Rivera*, 09-CR-619 (E.D.N.Y.) (Docket No. 231). Similarly, in a case where the defendant was charged with abusive sexual contact and assault on an airplane, Judge Amon permitted the victim-witness to testify using her first name only. *See* Transcript of April 5, 2016 Pre-Trial Conference at 6-10, *United States v. Quraishi*, 15-CR-598 (E.D.N.Y.) (Docket No. 46). In addition, at sentencings of sex traffickers, Judge Townes and Judge Amon permitted victims to give in-court victim impact statements using only their first name or the name Jane Doe, *see United States v. Angel Cortez-Granados*, 11-CR-657 (SLT); *United States v. Benito Lopez-Perez, et al.*, 11-CR-199 (CBA).

Requiring these witnesses to provide full identifying information does not serve any of the legitimate purposes identified by the courts, such as the defendant's obtaining information for in- or out-of-court investigation or attempting to discredit the victim before the jury. Rather, requiring the victims to provide their full names would serve only to harass, embarrass and "to humiliate or annoy the [victim]." *Marti*, 421 F.2d at 1266.   Indeed, requiring victims of sex trafficking or

witnesses to violent crimes to provide their full names in public could chill their willingness to testify, for fear of having their personal histories publicized, and the embarrassment and humiliation that such publicity could cause them as they rebuild their lives. In addition, a ruling requiring victims to disclose their full identities publicly and in open court could cause other victims to fear seeking help from law enforcement as that could subject them to further harassment and embarrassment.

Finally, the Defendant will be unable to articulate any "particularized need" for the disclosure of the witness's identifying information in open court. *See Smith v. Illinois*, 390 U.S. 129, 134 (1968) (White, J., concurring) (stating that after the government or witness has made a showing why non-disclosure is appropriate, the trial judge should evaluate the defendant's interest in disclosure); *United States v. Bennett*, 409 F.2d 888, 901 (2d. Cir. 1969) (district court did not err in allowing government witness to withhold specific place of employment where defense failed to demonstrate a "particularized need" for the information).   The Government's proposed protections will in no way impede or compromise the Defendant's confrontation rights.   The Defendant will not be prevented from presenting a defense in the event that these victims are only referred to by their first names during the trial.

Respectfully submitted,

CHANNING D. PHILLIPS
Acting United States Attorney
D.C. Bar No. 415793


By:  _____/s/_____
Amy E. Larson
NY Bar. No. 418221
555 4th Street NW
Washington, DC 20530
Amy.larson2@usdoj.gov


Dated: July 16, 2021